UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN P. AMOS<br>8959 Sycamore Ridge Road<br>Fairfax Station, VA 22039,<br><br>        Plaintiff,<br><br>   v.<br><br>THE DISTRICT OF COLUMBIA<br>John A. Wilson Building<br>1350 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004,<br><br>     and<br><br>EMEKA C. MONEME<br>Director, District Dept. of Transportation<br>1213 Fern Street, N.W.<br>Washington, D.C. 20012,<br><br>     and<br><br>PETER J. NICKLES, ESQ.<br>Interim Attorney General, District of Columbia,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT FOR EQUITABLE AND MONETARY RELIEF
AND DEMAND FOR JURY TRIAL

## Introduction

1.      This is a Civil Action brought by plaintiff Stephen Amos ("Amos"), the former

Chief of Staff of the District of Columbia Department of Transportation ("DDOT") until his

unlawful termination, effective January 28, 2008, against the District of Columbia ("D.C."),

DDOT Director Emeka C. Moneme ("Moneme"), and Interim Attorney General Peter J. Nickles ("Nickles") (collectively, "Defendants").

2.     Amos's subordinate conducted an investigation which ultimately determined, *inter alia*:  A) that DDOT had qualified Fort Myer Construction ("Fort Myer") as a Disadvantaged Business Enterprise ("DBE"); B) that since being released from its debarment, Fort Myer knowingly and fraudulently qualified for Federal Highway Administration ("FHWA") funds by entering into a subcontract with Peake Construction Company ("Peake") and using Peake as the certified DBE; C) that Peake is a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified as a DBE contractor by DDOT; and D) that neither Fort Myer nor the designated subcontractors were actually performing the work.

3.     Amos reported these investigation results and suspected violations to various officials, including, but not limited to Moneme and Nickles, the then-General Counsel to the Mayor of the District of Columbia.

4.     Amos's disclosure led to Moneme's retaliation against Amos, by threatening Amos and stripping Amos of his professional duties and responsibilities.

5.     Amos made his disclosures to Nickles as well.  At first Nickles encouraged Amos to come forward with the results of the investigation, but Amos wanted to be assured that he and his subordinates would not suffer any retaliation.  Nickles did not advise or assure Amos that Amos had a right to be protected from any retaliation as a result of Amos's obviously protected disclosures.

6.     The investigation of DDOT officials and their relationship with Fort Myer and Peake, and Amos's report of the investigation results and possible malfeasance to the DDOT

Director's Office, to the Executive Office of the Mayor, to the Office of the Inspector General ("OIG") and to the Federal Bureau of Investigation ("FBI") led Moneme to terminate Amos's employment in violation of the District of Columbia Whistleblower Protection Act, and federal law, 42 U.S.C. § 1983.

### Jurisdiction and Venue

7.    This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331 since there is a federal question that arises under the First Amendment to the Constitution, and the laws of the United States, specifically 42 U.S.C. § 1983. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332 since the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

8.    Venue in this district is appropriate pursuant to 28 U.S.C. § 1391, because Defendants' unlawful actions were taken within the District of Columbia in this judicial district.

9.    Pursuant to D.C. Code §§ 1-615.54(a) and 12-309, Amos provided Notice to the Mayor of his claims on February 21, 2008.

### Parties

10.    Plaintiff Amos was employed by the DDOT as the Chief of Staff to DDOT Director Moneme from July 2007 until Amos was unlawfully terminated, effective January 28, 2008.  Amos is a resident of the Commonwealth of Virginia.

11.    Defendant D.C., although designated pursuant to Article I, Section 8 of the Constitution as the capital of the United States, is a municipal corporation which governs D.C.

pursuant to The District of Columbia Self-Government and Governmental Reorganization Act, P.L. No. 93-108, 87 Stat. 774, D.C. Code § 1-211.  DDOT, Amos's former employer, is an agency of D.C., the functions of which include, among other matters, managing and maintaining transportation infrastructure for D.C.  DDOT is headquartered at Frank D. Reeves Municipal Center, located at 2000 14th Street, N.W., 6th Floor, Washington, D.C.  20009, where most of Defendants' unlawful actions toward Amos were taken.

12.     Defendant Moneme is the Director of DDOT, and as such, is its chief executive officer, with final decision making authority over the acts that underlie this Complaint.  Moneme is sued here in his official and his individual capacities.  Moneme's unlawful actions toward Amos were taken at locations within D.C., including, but not limited to, the DDOT headquarters. Moneme is a resident of the District of Columbia.

13.     Defendant Nickles is the Interim Attorney General for D.C.  At various times relevant to this complaint, Nickles was also serving as the General Counsel to the Mayor of the District of Columbia.  Nickles is sued here in is official and his individual capacities.  Nickles's unlawful actions toward Amos were taken at locations within D.C., including, but not limited to, the Executive Offices of the Mayor.  Upon information and belief Nickles is or is soon to be a resident of the District of Columbia.

### Factual Allegations

#### Amos's Arrival at DDOT

14.     On or about July 16, 2007, DDOT Director Moneme hired Amos to the position of Chief of Staff in the Management Supervisory Service.  Amos was the number two person in the office and reported directly to Moneme.

15.     Amos was responsible for overseeing the Offices of Integrity and Compliance, Risk Management/Emergency Preparedness, Communications, and Administrative and Management Support Services.  His responsibilities included assisting DDOT employees and management in achieving "the highest level of integrity in order that the agency's external customers receive reliable and efficient service."

16.     As of July 16, 2007, when Amos began as Chief of Staff, Amos was the fourth (4th) Chief of Staff for DDOT since the new administration came into office on January 1, 2007.

17.     As soon as Amos arrived at DDOT, he found the office in significant disarray, and in clear need of his expertise in assessing and resolving problems within the agency.

Amos First Learns of Suspicious Relationships at DDOT

18.     On or about July 23, 2007, Amos first learned about Fort Myer because of a July 6, 2007 report to the Office of Integrity and Workforce Relations.  The report disclosed that a street had collapsed due to the use of suspected low-grade asphalt on a contracting job.

19.     During the investigation of the incident, Amos learned that approximately five and a half years earlier, Fort Myer had been convicted of bribing a number of DDOT employees in a bid-steering and bid-rigging investigation conducted by the FBI.  As a result, Fort Myer had been debarred as a recipient of federally funded construction contracts for a period of eighteen months.

20.     Approximately one month later, on or about August 24, 2007, Ronnie Edwards ("Edwards"), the Chief EEO Officer for DDOT, requested that Amos sign a letter to Mark Kehrli ("Kehrli"), Division Administrator for the U.S. Department of Transportation ("USDOT").

21.    The letter stated that DDOT was not meeting its 2007 DBE goals under 49 C.F.R. Part 26.

22.    Since DDOT receives approximately ninety (90) percent of its funding from the USDOT's FHWA, approximately one hundred eighty million ($180,000,000) dollars per year, the FHWA requires that DDOT dedicate a minimum of ten (10) percent of federal funds for contracts with DBE-qualified businesses.

23.    The letter to Kehrli, which was drafted by Edwards, stated that DDOT had failed meet its DBE goals in accordance with 49 C.F.R. Part 26 because of mathematical errors in the previous assessments and improper DBE goal-setting by the DDOT.

24.    Edwards wanted to reduce DDOT's goals to allocate eleven (11) percent of funds to the DBE-qualified contractors, which was in accordance with what DDOT had actually been doing.

25.    Because Moneme was absent, Amos agreed to sign the letter to Kehrli in reliance on statements made by Francisco Edwin Gonzalez ("Gonzalez"), EO Specialist, and Amy Vance, both of whom Amos trusted.

26.    In November 2007, Amos fired Edwards from DDOT after receiving numerous harassment complaints about him and for ethical violations.

### Gonzalez Tells Amos of the Unlawful Contracts

27.    On or about December 3, 2007 (after Edwards had been fired by Amos for various ethical violations), Gonzalez revealed to Amos that Gonzalez was concerned about improprieties in the relationship between DDOT officials, Fort Myer, Peake and Pessoa Construction Company ("Pessoa").

28.     Gonzalez alluded to the close relationship between Fort Myer and Dan Tangerlini ("Tangerlini"), the former DDOT director and the current City Administrator.

29.     Gonzalez added that Fort Myer was a very large political contributor to Mayor Fenty's campaign and historically has been a very politically powerful company.

30.     Gonzalez articulated to Amos that because of its debarment up until the previous year, Fort Myer had been prohibited from access to federal funds or work on projects that included federal funds.

31.     Gonzalez believed that since the end of its debarment, Fort Myer had been working closely with DDOT officials to obtain USDOT funding for its contracts.

32.     This concern was also communicated to Amos by his subordinate, Danette Walker-Mincey ("Walker-Mincey"), the Chief of the Integrity Compliance Unit at DDOT at that time.

33.     Walker-Mincey stated that during this period of debarment, the previous agency Ethics Officer communicated that Fort Myer was given frequent and unprecedented access to then-Director of DDOT, Dan Tangerlini.

34.     At the time, Walker-Mincey had been employed with the Attorney General's General Counsel assigned to DDOT.

35.     Walker-Mincey further stated that she had frequently counseled Tangerlini as to the inappropriateness of the relationship with Fort Myer.

36.     As Fort Myer is not a qualified DBE, it formed relationships with subcontractors, such as Peake, who were qualified as DBEs.

37.     Not incidentally, Edwards, who was appointed by Tangerlini, had been in charge of qualifying contractors as DBEs for DDOT.

38.     Moreover, in conducting a site visit to the Foxhall Road, NW Safety Improvements Road Project on August 27, 2007, Gonzalez had discovered that Peake was not actually performing the work at the site. Rather, the work was being performed by a third party, DEN United – an entity DDOT had not authorized to be present on the work site.

39.     Thus, Fort Myer was not in compliance with the 29 C.F.R. Part 26 requirements.

40.     Gonzalez told Amos that he believed Peake is a shell company because it has no assets, no equipment, no trucks, and no office, and its CEO is Parney Jenkins, Sr. ("Jenkins").

41.     Jenkins is a former DDOT official who was convicted of taking bribes from Fort Myer.

42.     When Amos asked Gonzalez why he had not raised these issues earlier, Gonzalez replied that Edwards had prevented him from doing so. After Edwards was fired, Gonzalez felt comfortable talking to Amos.

43.     The following day, on or about December 4, 2007, Amos learned that Edwards was now working for Fort Myer and was acting as a facilitator/consultant to ensure that Fort Myer secured DDOT contracts. Edwards had been seen at DDOT headquarters working for Fort Myer even though Edwards had only recently been fired from DDOT by Amos.

<u>Gonzalez Gives Amos a Formal Memo Regarding the Unlawful Contracts</u>

44.     Later that day, on or about December 4, 2007, Gonzalez submitted a memo to Amos describing the problems with the Foxhall Road, NW Safety Improvements Project and a second project, the South Capitol Street, Near Term Improvement Project.

45.     With regard to the South Capitol Street Project, Gonzalez said he discovered in September that Pessoa, a DBE-qualified subcontractor working for Fort Myer, had contracted

sixty-two (62) percent of its work to Anchor Construction Company ("Anchor"), which was not DBE-qualified.

46.    According to Fort Myer's DBE Plan for this contract, Pessoa was to perform twenty-six (26) percent of the twenty-nine (29) percent DBE contract goal.

47.    Gonzalez determined that Pessoa was only performing ten (10) percent of the contract work.

48.    In his memo, Gonzalez further stated that a letter of noncompliance had been sent to Fort Myer in September of 2007.  Fort Myer responded that it was committed to its DBE goal as set forth in its DBE Plan and assured DDOT that it would meet its goals.  However, on November 13, 2007, Fort Myer asked for a waiver because it was unable to meet its DBE goals.


### Amos Discloses the Unlawful Activity to DDOT Director Moneme

49.    On or about December 5, 2007, Amos told DDOT Deputy Directors Ken Laden ("Laden") and Carol Kissal ("Kissal"), both jointly and separately, about the foregoing facts he learned from Gonzalez.

50.    Amos told Kissal that he planned to share this information with the OIG.

51.    Kissal became upset and stated that Tangerlini had advised her to manage these risk-related issues internally and said that it was best that the information not go outside of the Director's Office.

52.    Amos replied to Kissal that he had an obligation to disclose his concerns to the OIG.

53.    Later that same day, Moneme came to Amos's office "to talk," and Amos told Moneme about the information in Gonzalez's now-formal report.

54.    Amos further communicated to Moneme that Amos wanted to disclose the information to the OIG even though Kissal had said earlier that Amos should keep it "internal" which was her direction from Tangerlini.

55.    Moneme became angry and ordered Amos to keep the information internal and "quiet" and not share it with the OIG.

56.    Moneme's order contradicted Amos's duty to report the violation, so Amos contacted the OIG via e-mail and scheduled a confidential meeting for December 7, 2007.

<u>Amos Discloses the Unlawful Activity to General Counsel Nickles</u>

57.    On or about December 6, 2007, Amos called Nickles, General Counsel for the District of Columbia, to request a private meeting to share the foregoing information.

58.    During the call, Amos relayed a brief outline of his concerns.

59.    Amos was directed to come to Nickles's office in thirty minutes to meet with Nickles in person.

60.    At their meeting, Amos shared with Nickles an overview of the suspected misconduct and related to him the information Gonzalez had told Amos.

61.    Amos made these disclosures outside of his normal chain of command and exclusive of his official duties as Chief of Staff for DDOT.

62.    This misconduct that Amos reported included:  allegations of large and numerous financial contributions by Fort Myer's owners, family members, and employees to Mayor Fenty's campaign; DDOT officials' interventions to conceal and/or facilitate the ongoing practices of Tangerlini; bid-rigging and the steering of federally funded contracts to Fort Myer through Peake; and Edwards' likely involvement in criminal misconduct.

63.     After Amos relayed his concerns, Nickles said that Amos should report the information to the OIG's office.

## Amos Discloses the Unlawful Activity to the OIG

64.     On or about December 7, 2007, Amos and Walker-Mincey met with Leonard Odom ("Odom"), Assistant Inspector General.

65.     Amos was prepared to give a full briefing about his concerns and brought the corresponding investigative reports previously mentioned, but he and Walker-Mincey were extremely worried about the confidentiality of the information and whether they (or their subordinates) would suffer retaliation.

66.     In order to assuage Walker-Mincey's fears, before disclosing many details, Amos asked Odom about what protection the OIG could guarantee for Amos, Walker-Mincey, and any subordinates that would be coming forward.

67.     Odom told Amos that without knowing more details, he could not guarantee that the information would remain confidential or that Amos would not be retaliated against.

68.     Amos then told Odom that he would feel more comfortable if there was a joint meeting with the Federal Bureau of Investigation ("FBI").

69.     Odom told Amos that he did not want to set up a meeting with the FBI until he reviewed the documents and learned more details.

70.     When Amos and Walker-Mincey realized that the OIG would not offer any protection against retaliation, they decided not to share their concerns in further detail.

<u>Amos Again Reports the Unlawful Activity to Nickles</u>

71.    During their meeting on December 6, 2007, Nickles had agreed to call Amos a few days later to follow-up on the issues Amos raised during their meeting.

72.    On or about December 11, 2007, Amos called Nickles's office, because Amos had yet to hear from Nickles.

73.    As he had at their earlier meeting, Amos again requested that Nickles write a letter of assurance that Amos and his subordinates would not be retaliated against before they would disclose further information.

74.    Nickles changed his attitude of helpfulness and replied that he did not have the authority to make assurances without knowing more about the situation.

75.    However, as General Counsel to the Mayor, and as a practicing attorney Nickles was aware of the D.C. Whistleblower Protection Act that affords protection from retaliation to certain employees of the city government who blow the whistle regarding legal violations.

76.    Amos emailed to Nickles a number of documents related to a very recent example of a simple internal misconduct investigation.

77.    The documents involved an investigation regarding Kathleen Penney ("Penney"), DDOT's new Chief Engineer, in which the Office of Integrity and Compliance was thwarted and could not conduct a simple fact-finding investigation.

78.    At Tangerlini's direction, Moneme counseled Amos not to pursue this matter concerning Penney.

79.    As with Amos's previous telephone call to Nickles's office, within thirty minutes of the call, Amos was directed to meet with Nickles in person.

80.     Once there, Nickles chastised Amos for his failure to fully disclose the matter at hand to the OIG on December 7, 2007.

81.     Nickles did not wish to discuss any sort of assurances and emphatically stated:   "I do not make such commitments on a whim for employees that are in jeopardy and no letter of assurance will be forthcoming."

82.     Amos responded that he was not aware that his position was in jeopardy, and Nickles did not respond.

83.     Amos made these disclosures to Nickles outside of Amos's normal chain of command and exclusive of Amos's official duties as Chief of Staff for DDOT.


Amos Reports Unlawful Activity to the FBI

84.     Amos left the meeting and immediately made contact with the Washington Field Office of the Federal Bureau of Investigation.

85.     Amos made a full and complete disclosure of the events to date.

86.     Amos made these disclosures outside of his normal chain of command and exclusive of his official duties as Chief of Staff for DDOT.

87.     Additionally, on or about December 11, 2007, Walker-Mincey submitted a memo to the Office of the Director, which re-stated the problems in Gonzalez's December 4, 2007 memo.

88.     With regard to the Foxhall Road, NW Safety Improvements project, Walker-Mincey recommended that the Office of Integrity and Workforce Relations ascertain whether Peake is a viable company operating on D.C. contracts, whether Peake acted improperly in

subcontracting out work to be performed, whether Fort Myer was aware of the problems, and whether the problem may exist in other contracts involving Peake and Fort Myer.

89.     As to the South Capitol Street, Near Term Improvement project, Walker-Mincey agreed with Gonzalez's recommendation that Fort Myer should not be awarded any new contracts until it complies with outstanding requests and can submit a valid DBE Plan that will be complied with earnestly.

Moneme Threatens Amos

90.     On or about the morning of December 12, 2007, Moneme held the first of a series of scheduled Contract Meetings with the relevant parties present: Procurement, General Counsel, Civil Rights, Office of Integrity, and Amos, the Chief of Staff.

91.     During the meeting Moneme received an "emergency call from downtown," which caused Moneme to abruptly leave the room and postpone the meeting indefinitely.

92.     Later that day, Moneme came to Amos's office and screamed at Amos for "betraying" him by talking to the OIG.

93.     Moneme said that the Mayor's Office had informed him that Amos had breached his trust and that Amos's actions had been inappropriate because this should have remained an internal matter.

94.     Then, Moneme yelled that Amos should be "sequestered in [his] office" or in the alternative that that Amos "should [be] escorted out of the building."

95.     After making these threats, Moneme demanded Amos's notes and files from the earlier meeting and instructed that Amos would be "precluded from all further investigations," even though investigations were Amos's main responsibility.

96.     Just before he left Amos's office, Moneme said to him threateningly, "you're done."

## Amos Reports Moneme's Retaliation to Nickles

97.     Amos left the building shortly thereafter to write the end of an e-mail to Nickles detailing Moneme's threats.

98.     In the e-mail to Nickles, Amos stated that the letter was to summarize for the record the communications to date regarding Amos's reporting of suspected criminal misconduct involving members of the D.C. Cabinet, DDOT, Office of Procurement and Contracting, Fort Myer Construction Corp., and its subcontractors, including Peake Construction Corp.

99.     Amos told Nickles that he felt "compelled to communicate that which had been stymied internally and that which [he] believed to be an on-going criminal enterprise affecting the District of Columbia."

100.    Amos made these disclosures outside of his normal chain of command and exclusive of his official duties as Chief of Staff for DDOT.

101.    After Amos sent the e-mail to Nickles, Amos received notification that a 3:00 p.m. meeting with Moneme was cancelled.

102.    Previously, Amos had heard a rumor that Moneme was going to terminate him at the 3:00 p.m. meeting.

103.    Later that same day, Amos was notified by Walker-Mincey that Moneme had contacted her regarding Amos's meeting with the OIG.

104.    Walker-Mincey reported that Moneme demanded a copy of the document that gives the authority to Amos or anyone else to go to the OIG without the Director's approval.

Walker-Mincey reportedly gave the director a copy of the Standard Operating Policy ("SOP") that gives this authority. The section was highlighted and later provided to Amos.

## Moneme Strips Amos of his Duties

105.     On January 8, 2008, Amos met with Moneme for his routine morning meeting. Kissal was also present.

106.     Without warning, Moneme announced that he was removing responsibility for "Position Authority" (control of employees) from Amos and giving it to Kissal, who oversaw the Office of Resource Management.

107.     Moneme's reason was that Amos's office had "poor controls."

108.     In another meeting later that morning with all the Associate Directors present, Moneme announced publicly that he was taking away responsibility for Position Authority from Amos and giving it to Kissal because Amos had no personnel authority or expertise in this area and Moneme was unhappy with Amos's hiring strategy.

109.     Moneme gave two examples to support his decision, which were both incorrect.

110.     However, Moneme's current position contradicted his statement in the last Office of the Director Meeting in late December of 2007 (in which Amos's subordinates were present) when Moneme recognized that Amos's hiring campaign was one of the great achievements of the past year.

## Amos Makes More Detailed Disclosures to the FBI and Gives Notice of Protected Action

111.     On or about January 9, 2008, Amos met with the FBI to further discuss his previous disclosures.

112.    On the same day, Amos's attorney sent a letter to Nickles, with a copy to Moneme, explaining that Amos was a whistleblower and that Amos had engaged in protected activity and there should be no further retaliation against him.

113.    On or about January 10, 2008, Amos's attorney sent the letter by fax to Moneme's private fax number.

114.    Amos made all of these disclosures outside of his normal chain of command and exclusive of his official duties as Chief of Staff for DDOT.

### Moneme Continues to Retaliate and Strip Amos's Duties

115.    The following day, on or about the morning of January 11, 2008, Amos met with Moneme and one of Amos's subordinates, Penney, an Associate Director appointed by Tangerlini.

116.    Amos asked Moneme why he had consulted Penney, rather than Amos regarding incidents involving Lasharn Hamilton ("Hamilton") and Michael Scott ("Scott").

117.    Moneme became very angry with Amos and stated:  "I am the Director and the Associate Directors report to me and not to you and hence they are only accountable to me."

118.    Amos responded to Moneme that he disagreed with him because the Associate Directors also report to Amos and are his subordinates.

119.    Amos showed Moneme a copy of Amos's Position Description, which verified that both Scott and Hamilton were Amos's direct subordinates.

120.    Moneme angrily replied:  "I was a Chief of Staff and I know exactly what your role is . . . you will defer to the Associate Directors and so will your subordinates (the Operations Managers)."

121.     Moneme then stated that Scott and Hamilton were "not to do anything without Kathleen [Penney]'s permission."

122.     Amos reminded Moneme again that Scott and Hamilton did not report to Penney, rather they reported to Amos.

123.     Amos also stated that he is not subordinate to Penney, and cannot effectively serve as Chief of Staff if both he and his staff are subordinate to Penney.

124.     Moneme "blew up" and yelled, "Am I not still the Director?"  Then he immediately stood up and left the room.


<u>Moneme Terminates Amos</u>

125.     At approximately 2:00 p.m. on the same day, Amos was having a closed-door meeting in his office with Hamilton to discuss Scott's EEO complaint against Penney, the subject of the earlier meeting with the Director.

126.     Amos heard a forceful knock at the door, startling both him and Hamilton.  Rarely would anyone knock when Amos's door was closed due to the nature of his job (i.e., he conducted interviews and investigations related to civil rights complaints in his office).

127.     As Amos walked to the door to open it, Moneme opened the door himself and stood in the doorway with a manila folder in his hand.  Amos stated, "Can I help you, Sir?"

128.     Moneme looked into the office and saw Hamilton.  Hamilton appeared very uncomfortable and stood up to leave the office.  Moneme said that he wanted to talk to Amos.

129.     Amos asked if he would like to meet immediately and Moneme said that he would wait outside, suggesting to Amos that the meeting with Hamilton was over.

130.    As Hamilton left the office, Moneme turned toward Amos with a look of hostility and entered his office.   Amos closed the door because he was afraid this would be a loud scene. In the past, Moneme only came to see Amos if he was angry because their offices were on different floors.  Amos asked Moneme to be seated and then sat down across from him.

131.    Moneme quickly opened the manila folder and stated, "I have something to give you . . . you can read and sign it if you wish . . . or you can just keep a copy."  He handed Amos a letter of termination, which provided that Amos's termination was effective on January 28, 2008, and Amos would be on administrative leave until that time.

132.    Moneme said that Amos must leave the office immediately.  Moneme paused and then, as he was standing to leave Amos's office said, "thank you for your service."

133.    Moneme never made eye contact with Amos, nor did he shake hands.

134.    Right away, Amos sent an e-mail to his attorney, shut down his computer, picked up his personal belongings, and left the office.

135.    On his way out, Amos saw his Executive Assistant, Belynda Roebuck ("Roebuck"), and asked her to come into his office.  Amos told her that he had to leave and when she looked puzzled, he told her that he had been let go.  Roebuck started crying and after reassuring her that "it would be okay," Amos immediately left the office.


<u>Amos Continues Reporting to the OIG and to the General Counsel to the Mayor</u>

136.    Even after Moneme gave Amos notice of Amos's termination and put Amos on administrative leave, Amos continued to disclose Fort Myer's unethical and fraudulent practices.

137.    On our about January 22, 2008, Amos and his attorney met with the OIG and fully disclosed all the events, as outlined above, that had occurred during Amos's tenure at

DDOT, including Fort Myer's unethical practices, the inappropriate relationship between DDOT officials and Fort Myer and Moneme's retaliation against Amos.

138.    The following day, on or about January 23, 2008, Amos and his attorney met with Andrew T. "Chip" Richardson, III, the Interim General Counsel to the Mayor for the District of Columbia to disclose the events outlined above.

139.    These disclosures occurred outside of Amos's chain of command and exclusive of his performance of his official duties.

140.    By complaining to Laden, Kissal, Moneme, Nickles, Richardson, the OIG and the FBI that since being released from its debarment, Fort Myer knowingly and fraudulently qualified for FHWA funds by entering into a subcontract with Peake and using Peake as the certified DBE, Amos was making a protected disclosure.

141.    Amos also reported that Peake is likely a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified by Edwards as a DBE contractor.

142.    Moreover, according to Gonzalez's site visits to the Foxhall Road and South Capitol Projects, neither Fort Myer nor the designated subcontractors were actually performing the work.

143.    After Amos made these protected disclosures, Moneme retaliated against him because of his protected disclosures.

144.    Moneme immediately diminished Amos's responsibilities, took away Amos's files and threatened to sequester Amos in his office or to have him escorted from the building. Then, approximately one month after his disclosures, Moneme terminated Amos.

**Count I**
**First Amendment**
**Freedom of Speech**
**(As Against all Defendants)**

145.    Amos incorporates and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

146.    Defendants, and each of them, retaliated against Amos and eventually terminated him because Amos reported to the DDOT Director's Office, to the Executive Office of the Mayor, to the OIG and to the FBI that, *inter alia*, since being released from its debarment, Fort Myer knowingly and fraudulently qualified for FHWA funds by entering into a subcontract with Peake and using Peake as the certified DBE, that Peake is likely a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified by Edwards as a DBE contractor, and that neither Fort Myer nor the designated subcontractors were actually performing the work.

147.    By reporting to the OIG, the FBI, and the D.C. General Counsel, Amos was reporting outside of his normal chain of command and his disclosures went beyond his official duties.

148.    By reporting Fort Myer's fraudulent activities and its inappropriate relationship with DDOT officials, Amos was speaking on a matter of public concern.

149.    Amos's disclosures did not adversely affect the Defendants' efficiency interest nor did it cause a substantial disruption in the workplace.

150.    Because Amos was speaking outside of his official duties on a matter of public concern that did not adversely affect the efficiency interest of the Defendants, his speech was protected.

151.    Amos's protected speech was a substantial or motivating factor in the Defendants' termination of Amos's employment and their participation in actions which naturally and proximately caused the termination of his employment with DDOT.

152.    Defendants would not have terminated Amos but for his protected speech.

153.    Defendants' termination of Amos's employment and participation in actions which naturally and proximately caused the termination of Amos's employment with DDOT deprived Amos of his right to freedom of speech.

154.    Defendants, and each of them, violated the First Amendment to the Constitution by terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT because of Amos's protected disclosures and thereby deprived Amos of his right to freedom of speech.

155.    Defendant Moneme violated clearly established rights under the First Amendment to the Constitution of which a reasonable person would have known in terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT and thereby deprived Amos of his right to freedom of speech.

156.    Defendants' actions in unlawfully terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT as alleged in the above paragraphs caused Amos to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

157.    Defendants' actions in unlawfully terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's

employment with DDOT as alleged in the above paragraphs caused Amos to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

158.    Defendants' actions in unlawfully terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to Amos's rights under the First Amendment to the Constitution, and were taken outrageously, wantonly, and oppressively with legal and actual malice.

**Count II**
**First Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against all Defendants)**

159.    Amos incorporates and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

160.    Defendants, and each of them, retaliated against Amos and eventually terminated him because Amos reported to the DDOT Director's Office, to the Executive Office of the Mayor, to the OIG and to the FBI *inter alia*: that since being released from its debarment, Fort Myer knowingly and fraudulently qualified for FHWA funds by entering into a subcontract with Peake and using Peake as the certified DBE, that Peake is likely a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified by Edwards as a DBE contractor, and that neither Fort Myer nor the designated subcontractors were actually performing the work.

161.    Defendants' termination of Amos's employment and participation in actions which naturally and proximately caused the termination of Amos's employment with DDOT because of his protected disclosures deprived Amos of his right to freedom of speech.

162.    Defendants, and each of them, violated the First Amendment to the Constitution and violated clearly established rights under the First Amendment to the Constitution of which a reasonable person would have known in terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT and thereby deprived Amos of his right to freedom of speech.

163.    Defendants, and each of them, acted under color of the law of the District of Columbia in terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT and thereby deprived Amos of his right to freedom of speech.

164.    Defendants' actions were carried out by Defendant Moneme, an official with final decision-making authority to investigate and terminate the Chief of Staff without due process of law in furtherance of the policy and custom of Defendant D.C.

165.    Defendants, and each of them, violated 42 U.S.C. § 1983 in terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT by subjecting or causing Amos to be subjected to the deprivation of his rights and privileges secured under the First Amendment to the Constitution under color of the law of the District of Columbia.

166.    Defendants' actions in terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT as alleged in the above paragraphs caused Amos to suffer pecuniary losses, injuries, and

damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

167.     Defendants' actions in terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT as alleged in the above paragraphs caused Amos to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

168.     Defendants' actions in terminating Amos's employment and participating in actions which naturally and proximately caused the termination of Amos's employment with DDOT as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to Amos's rights under the First Amendment to the Constitution and 42 U.S.C. § 1983, and they were taken outrageously, wantonly, and oppressively with legal and actual malice.

### Count III
### D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*
### (As Against the District of Columbia)

169.     Amos incorporates and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

170.     Amos's December 5, 2007 report to Laden and Kissal, his December 5, 2007 report to Moneme, his December 6, 2007 report to Nickles, his attorney's December 9, 2007 letter to Nickles and Moneme, his December 11, 2007 report to Nickles, his December 11, 2007 report to the OIG, his December 11, 2007 report to the FBI, his December 12, 2007 email to Nickles, his January 22, 2008 report to the OIG and his January 23, 2008 report to the D.C.

General Counsel's office, all describing the problems with the Foxhall Road, NW Safety

Improvements Project and the South Capitol Street, Near Term Improvement Project and the

improper relationship between Ft. Myer and Peake and Pessoa and DDOT officials as alleged

above, *inter alia*, constituted protected disclosures under the D.C. Whistleblower Protection Act,

D.C. Code § 1-615.52(a)(6).

171.    Defendant D.C.'s actions, *inter alia*, of attempting to coerce Amos into ignoring

the improprieties in the relationship between DDOT officials and Fort Myer Construction, telling

Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on

administrative leave, and terminating Amos's employment with DDOT constituted prohibited

personnel actions under the D.C. Whistleblower Protection Act, D.C. Code § 1-615.52(a)(5).

172.    Defendant D.C. violated the D.C. Whistleblower Protection Act, D.C. Code §§ 1-

615.51, *et seq.*, in attempting to coerce Amos into ignoring the improprieties in the relationship

between DDOT officials and Fort Myer Construction, telling Amos to keep the matter internal,

stripping Amos of his job responsibilities, placing Amos on administrative leave, and terminating

Amos's employment with DDOT.

173.    Defendant D.C.'s actions in attempting to coerce Amos into ignoring the

improprieties in the relationship between DDOT officials and Fort Myer Construction, telling

Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on

administrative leave, and terminating Amos's employment with DDOT as alleged in the above

paragraphs caused or threatened to cause Amos to suffer pecuniary losses, injuries, and damages

including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

174.    Defendant D.C.'s actions in attempting to coerce Amos into ignoring the

improprieties in the relationship between DDOT officials and Fort Myer Construction, telling

Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on administrative leave, and terminating Amos's employment with DDOT as alleged in the above paragraphs caused Amos to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

175.    Defendant D.C.'s actions in attempting to coerce Amos into ignoring the improprieties in the relationship between DDOT officials and Fort Myer Construction, telling Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on administrative leave, and terminating Amos's employment with DDOT as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to Amos's rights under the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*, and were taken outrageously, wantonly, and oppressively with legal and actual malice.

### Prayer for Relief

Wherefore, Plaintiff Stephen Amos respectfully requests that the Court enter judgment in his favor and award him the following relief:

A.    an Order declaring that Defendants violated Amos's rights under the First Amendment to the Constitution, 42 U.S.C. § 1983, and the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*, in attempting to coerce Amos into ignoring the improprieties in the relationship between DDOT officials and Fort Myer Construction, telling Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on administrative leave, and terminating Amos's employment with DDOT; and that Defendants wrongfully terminated

Amos in violation of public policy, which restrains and enjoins Defendants from further violating

Amos's rights and wrongfully terminating his employment with DDOT;

B.     an Order reinstating Amos in the employ of DDOT retroactive to January 28,

2008;

C.     record correction and expunction;

D.     compensatory damages in an amount to be determined at trial, in excess of

$75,000 from all Defendants jointly and severally, to compensate Amos for pecuniary losses,

injuries, and damages proximately caused by Defendants' unlawful conduct;

E.     punitive damages in an amount to be determined at trial no less than ten times the

amount of compensatory damages from all Defendants jointly and severally;

F.     the attorneys' fees and costs incurred by Amos in the prosecution of this action

from all Defendants jointly and severally;

G.     and such other relief as may be just and appropriate.


## Demand for Jury Trial

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

Respectfully Submitted,

Adam Augustine Carter, Esq.
R. Scott Oswald, Esq.
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
acarter@employmentlawgroup.net
soswald@employmentlawgroup.net
*Counsel for Plaintiff Stephen Amos*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Stephen P. Amos

**DEFENDANTS**

The District of Columbia, Emeka C. Moneme and Peter J. Nickles, Esq.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT __District of Columbia__
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Fairfax, VA__
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

R. Scott Oswald and Adam Augustine Carter
The Employment Law Group, P.C.
888 17th Street N.W., Suite 900
Washington, D.C. 20006
(202) 261-2803

ATTORNEYS

Case: 1:08-cv-00554
Assigned To : Collyer, Rosemary M.
Assign. Date : 3/31/2008
Description: General Civil

*JURY ACTION*

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

◉ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

4

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Plaintiff was terminated in violation of the First Amendment to the Constitution, 42 U.S.C. 1983, and D.C. Code 1-615.51, et seq.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** in excess of $75,000 <br> **JURY DEMAND:** | Check YES only if demanded in complaint <br> YES ☒  NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 3/28/2008    SIGNATURE OF ATTORNEY OF RECORD _[signature]_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.