## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
                                   )
**STEPHEN P. AMOS**                )
**8959 Sycamore Ridge Road**       )
**Fairfax Station, VA 22039**      )
                                   )
           **Plaintiff,**          )
                                   )
**v.**                             )
                                   )   **Civil Action No. 08-00554(RMC)**
**THE DISTRICT OF COLUMBIA**       )
**John A. Wilson Building**        )
**1350 Pennsylvania Avenue, N.W.** )
**Washington, DC 20004**           )
                                   )
**And**                            )
                                   )
**EMEKA C. MONEME**                )
**Director, District Dept. of Transportation**)
**1213 Fern Street, N.W.**         )
**Washington, D.C. 20012**         )
                                   )
**And**                            )
                                   )
**PETER J. NICKLES, ESQ.**         )
**Interim Attorney General,**      )
**District of Columbia**           )

### DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants District of Columbia, Emeka Moneme, and Peter Nickles (hereinafter "defendants"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby move this Honorable Court to dismiss plaintiff's Complaint.  As grounds therefor, the defendants state that**:**

   1)  The plaintiff cannot sustain a claim under the First Amendment.

   2)  The defendants Emeka Moneme and Peter Nickles are entitled to qualified immunity

1

for plaintiff's First Amendment claims.

3)  The plaintiff has failed to state a claim under the Whistle Blower Act ("WPA").

Accordingly, dismissal is appropriate.  A Memorandum of Points and Authorities in support of

this Motion, along with a proposed Order, is attached hereto.

<div style="margin-left: 40%;">

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General for the District of
Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation
Division

_____/s/   Ellen Efros_____
ELLEN EFROS [250746]
Assistant Deputy Attorney General, Civil Litigation
Division

_/s/    Leah Taylor_____
LEAH BROWNLEE TAYLOR [488966]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7854; (202) 727-6295
leah.taylor@dc.gov

</div>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                            )
**STEPHEN P. AMOS**                         )
**8959 Sycamore Ridge Road**                )
**Fairfax Station, VA 22039**               )
                                            )
            **Plaintiff,**                  )
                                            )
        **v.**                              )
                                            )     **Civil Action No. 08-00554 (RMC)**
**THE DISTRICT OF COLUMBIA**                )
**John A. Wision Building**                 )
**1350 Pennsylvania Avenue, N.W.**          )
**Washington, DC 20004**                    )
                                            )
**And**                                     )
                                            )
**EMEKA C. MONEME**                         )
**Director, District Dept. of Transportation**)
**1213 Fern Street, N.W.**                  )
**Washington, D.C. 20012**                  )
                                            )
**And**                                     )
                                            )
**PETER J. NICKLES, ESQ.**                  )
**Interim Attorney General,**               )
**District of Columbia**

### MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING DEFENDANTS' MOTION TO DISMISS

In support of their motion to dismiss plaintiff's Complaint, the defendants state as follows:

3

## *BACKGROUND*

On or about March 31, 2008, Plaintiff, former Chief of Staff for the District of Columbia Department of Transportation ("DDOT") filed a complaint against the defendants claiming that his First Amendment Rights and rights under the District of Columbia Whistleblower Protection Act ("WPA")were violated when he was allegedly terminated for reporting governmental misconduct and violations of federal regulations related to Fort Meyer Construction Company ("Fort Myer"), a District contractor, who plaintiff claims to have fraudulently qualified for and maintained Disadvantaged Business Enterprise ("DBE") status. *See Complaint*, generally.

On July 16, 2007, Plaintiff began working as DDOT' s Chief of Staff under the Director of DDOT, Mr. Emeka Moneme. *See Complaint* at ¶16.  Plaintiff claims that as Chief of Staff, he was "responsible for overseeing the Office of Integrity and Compliance, Risk Management/Emergency Preparedness, Communications, and Administrative and Management Support Services." *See Complaint* at ¶15.   His responsibilities as Chief of Staff specifically included "assisting DDOT employees and management in achieving the highest level of integrity in order that the agency's external customers receive reliable and efficient service". *Id*. Investigations were plaintiff' s main responsibility. *Id*. at ¶95.

Prior to the plaintiff's arrival, DDOT had entered into a contract with Fort Myer Construction Company. *Id*. at ¶18.  DDOT receives federal funding from the USDOT's FHWA. *Id.* at 20-22.  FHWA requires a minimum of 10 percent of federal funds for contracts with DBE businesses. *Id.*  Shortly after plaintiff's arrival, on August, 2007 plaintiff advised the USDOT's FHWA, by signed letter, that DDOT was unable to meet its DBE goal. *Id.*

4

In September 2007, Plaintiff's subordinate and EEO Specialist, Francisco Gonzalez conducted an investigation of Fort Meyer Construction Company and allegedly determined that Fort Meyer's DBE qualified subcontractor was not performing work at the site of construction and that the work was being performed by an unauthorized subcontractor. *Id ¶¶36-38.* Gonzalez also discovered that another Fort Meyer DBE subcontractor had contracted out its work to a non-DBE subcontractor. *Id. at ¶45.* That month Gonzalez sent a letter of noncompliance to Fort Meyer Construction Company. Id. at ¶48. Fort Meyer initially informed DDOT that it was committed to trying to meet its DBE goal, and then later acknowledged noncompliance, and requested a waiver on November 13, 2007 because it was unable to meet its DBE Goal. *Id.*

In December 4, 2007, Mr. Gonzalez formalized his investigative findings in a report and provided the report to Plaintiff, his superior. *Id.* at ¶44. On December 5, 2007, Plaintiff allegedly spoke to Mr. Moneme about Mr. Gonzalez's findings in his subordinate's findings and report and Plaintiff advised Moneme that he wanted to disclose the information to OIG. Moneme allegedly advised the plaintiff to manage the situation internally. Plaintiff believed he had a "duty to report" the allegedly violations he learned from Gonzalez. *Id.* at ¶56.

Pursuant to his "duty to report" the information he learned from Gonzalez, on December 5, 2007, Plaintiff spoke to two Deputy Directors, Laden and Kissal, concerning the Gonzalez report. *Id.* at ¶49. Again, pursuant to his "duty to report" violations, on December 6, 2007, Plaintiff spoke to Peter Nickles, former General Counsel to the Mayor of the District of Columbia concerning the: financial contributions by Fort Meyer's owners, family member, and employees to Mayor Fenty's campaign; DDOT officials' interventions to conceal and/or facilitate the ongoing practices of Tangerlini; bid-rigging and the steering of federally funded

5

contracts to Fort Meyer through Peake; and a former employee's likely involvement in government conduct. *See Complaint* at ¶¶49-63. Peter Nickles encouraged him to share his information concerning the alleged misconduct with OIG. *See Complaint* at ¶63.

Pursuant to his "duty to report" the information he learned from Gonzalez, on December 6, 2007, the Plaintiff, along with a Danette Walker- Mincey, Plaintiff's subordinate and Chief of the Integrity and Compliance Unit at DDOT, met with an OIG Assistant Inspector General. *Id* at ¶64. Plaintiff was "prepared to give a full briefing about his concerns", but failed to provide many details concerning the alleged misconduct because OIG "would not offer any protection against retaliation". *Id.* at ¶¶64-70. In fact, other than discussions regarding guarantees of confidentiality and non-retaliation, the complaint is void of any reference to substantive discussions between Plaintiff and OIG that day. *Id.*

On December 11, 2007, Plaintiff met with Peter Nickles again, providing him information regarding the thwarting of an internal "simple fact-finding investigation" at DDOT and discussing "assurances" regarding his whistleblower status. *Id.* at ¶¶71-83. Peter Nickles allegedly refused to provide assurances and allegedly stated that "I do not make such commitments on a whim for employees that are in jeopardy". *Id.* at ¶81.

Plaintiff again, pursuant to his "duty to report" the information he learned from Gonzalez, "made contact" with the Washington Field Office of the Federal Bureau of Investigation ("FBI") that same day and made a complete disclosure of the events to date. *Id.* at ¶¶84-85. Also, on the same day, Plaintiff's subordinate, Danette Walker- Mincey ,recommended that the Office of Integrity and Workforce Relations investigate Fort Meyer and their subcontractor and recommended, consistent with Gonzalez's recommendation one week earlier, that no new

6

contracts be awarded to Fort Meyer until Fort Meyer complied with outstanding requests and submitted a valid DBE. *Id.* at ¶¶87-89.

As of December 11, 2008, according to Plaintiff's complaint, under his authority, DDOT Office of Integrity and Compliance and EEO specialist had already recommended an investigation of Fort Meyer. *See* Complaint, generally. Plaintiff decided to make additional contact regarding Fort Meyer not just with OIG, but with the FBI, creating the possibility of 3 (three) independent governmental agencies investigating the same company and District officials for alleged "governmental misconduct". *See Complaint*, generally. Based on Plaintiff's own averments that 1) he personally informed USDOT's FHWA that DDOT was unable to meet its DBE goal and 2) Fort Meyer acknowledged its failure to meet its DBE goal and requested a waiver of DBE compliance, under federal regulations 49 C.F.R. Part 26, Plaintiff knew or should have known that there was no violation of the law by Fort Meyer or the District of Columbia before he spoke to Peter Nickles, OIG and the FBI.

On December 12, 2007, Emeka Moneme, after his first scheduled Contracts Meeting with the "relevant parties", allegedly acknowledged that he learned from the Mayor's Office that the Plaintiff had talked to OIG. *Id*. at ¶¶90-93. Mr. Moneme allegedly yelled and told that Plaintiff that he should be "sequestered in his office" or "escorted out the building" and precluded Amos from further investigations, even though investigations were the Plaintiff's "main responsibility". *Id* at ¶¶93-95.

On January 9, 2008, Plaintiff pursuant to his "duty to report" the information he learned from Gonzalez, met with FBI again to further discuss previous disclosures. On the same day,

Plaintiff's attorney sent a letter to Nickles regarding the Plaintiff's whistleblower status and on January 10 sent a letter to Moneme. *Id.* at ¶¶111- 114.

On January 11, 2008, after the Plaintiff and Moneme had a verbal disagreement over the Plaintiff's position authority, Moneme gave the Plaintiff a letter of termination effective January 28, 2008 and told the Plaintiff that he would be on administrative leave on that time. Plaintiff does not allege that Peter Nickles terminated him or placed him on administrative leave. Id. at ¶¶115-131

On January 22, 2008 and January 23rd 2008 , *after* Moneme made his decision to terminate the Plaintiff, Plaintiff and his attorneys met with OIG and Chip Richardson, Interim General Counsel to the Mayor, respectively, and allegedly disclosed the events as outlined. Id. at ¶¶137-138.

As set forth below, defendants are entitled to dismissal of plaintiff's Complaint for the following reasons.

### *ARGUMENT*

### A.    <u>Standard for Motion to Dismiss</u>

The Supreme Court has recently clarified the standard by which a complaint challenged by a Rule 12(b)(6) motion must be judged. In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Court held that, while a complaint so attacked "does not need detailed factual allegations, [it] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Slip op.* at 8.  The Court specifically disavowed *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), which innumerable courts have cited over the decades for the proposition that "a complaint should not be dismissed for failure to state a claim

8

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*'s "no set of facts language has been questioned, criticized, and explained away long enough. [A]fter puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . . *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic*, *supra*, at 16–17.

More specifically, the Court noted that, for a complaint to survive a Rule 12(b)(6) motion to dismiss, there must be a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim." *Id*. at n.8 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Here, the Complaint fails to meet even this minimal standard; it is precisely what *Bell Atlantic* rejected—conclusory claims that the Plaintiff engaged in "First Amendment" speech outside his normal chain of command and exclusive of his official duties without any factual basis to substantiate his claims and conclusory references to "protected disclosures" regarding governmental misconduct and violations of the law that are unsupported by Plaintiff's factual averments. Despite the length of Plaintiff's one hundred and seventy five paragraphed complaint, Plaintiff's complaint falls far short of establishing any non-speculative facts that demonstrate his entitlement or right to relief. Plaintiff's complaint should therefore, be dismissed under Rule 12(b)(6).

**B.**    <u>**Plaintiff Cannot Sustain a Claim Under the First Amendment**</u>

**1. Plaintiff Did Not Speak As a Private Citizen**

When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and "the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Ultimately, "[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission," and "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 1960.  "The First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities," *Id.* at 1961.

Therefore, a public employee's cause of action for retaliation in violation of the First Amendment requires proof of four elements: (1) the public employee must have spoken as a citizen on a matter of public concern.; (2) that the employee's First Amendment interest is not outweighed by the governmental interest of promoting the efficiency of the public service performed through its employees; (3) that the employee's speech was a substantial or motivating factor for the denial of a right or benefit; and (4) that the government would not have reached the same decision absent the protected conduct in which the employee engaged. *See Garcetti* 547 U.S. at 699 (2006).  *See also Tao v. Freeh*, 27 F.3d 635, 638-39 (D.C. Cir. 1994); *Leonard v. D.C.,* 794 A.2d 618 (D.C. 2002). "The first two factors . . . are questions of law for the court to resolve, while the latter are questions of fact ordinarily for the jury." *Tao*, 27 F.3d at 639.

*Garcetti* holds that the first inquiry in a First Amendment analysis is whether the plaintiff was speaking as a citizen. *Garcetti*, 547 U.S. at 699. The Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . .". *Garcett*i, 547 U.S. at 420-422. *Garcetti* involved a state deputy attorney who was reassigned and denied a promotion after he wrote a memo to his supervisors about inaccuracies in an affidavit used to procure a search warrant. The Supreme Court held that when the plaintiff wrote his memo and had later discussions with his supervisors concerning the inaccuracies of the search warrant, he did not speak as a citizen, but spoke as a government employee. The Court found that "when he went to work and performed the task he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance" *Id.* at 1960. The Court found that because plaintiff's speech was pursuant to his official duties, he was not acting as a private citizen and did not enjoy First Amendment protection.

*Garcetti* and its progeny instruct that in cases where government employee speech falls within the scope of the employee's employment responsibilities, there is no First Amendment protection. The D.C. Circuit held in *Wilburn v. DC*, 480 F.3d 1140 (D.C. Cir. 2007), that the plaintiff, the former interim Director of the Office of Human Rights, had no First Amendment protection when she complained of racism and sexism to the Department of Personnel, a Deputy Mayor, and the Mayor's Chief of Staff concerning the Department of Personnel's rejection of her salary recommendations for two (2) African American females. The Circuit noted the first inquiry was whether "Wilburn spoke as a citizen on a public issue in asserting that differentiation between job applicants from inside and outside District government violated the Human Rights

11

Act and the United States Constitution" and intimating that the denial of the salaries she requested for her two subordinates was motivated by their race and gender." *Id.* at 1149. According to the Court, Wilburn had no First Amendment protection because her speech was made in the context of her employment as interim Director of the Office of Human Rights, where her responsibilities included salary and hiring matters pursuant to her authority under D.C. regulations, and her "official position description included identifying and eliminating discriminatory practices in employment." *Id*. at 1150-1151.  The Court determined that "Wilburn was hired not only to direct personnel matters in OHR but also to root out discrimination in the District government and, thus, when Wilburn commented on racial discrimination in the performance of her duties, she did not speak as a citizen." *Id*. at 1151.

    Other Circuit courts have similarly held that a public employee enjoys no First Amendment Protection when the speech is made in the course or scope of their employment responsibilities. For example, in *Battle v. Board of Regents for Ga.*, 468 F.3d 755 (11th Cir. 2006), a public employee alleging retaliation for her exposing inaccuracy and fraud in a college's financial aid system "admitted that she had a clear employment duty to ensure the accuracy and completeness of student files as well as to report any mismanagement or fraud she encountered." *Id*. at 761. *See Hill v. Bourough of Kutztown* 455 F.3d 225, 242 (3d Cir. 2006)(holding that  a public employee enjoys no First Amendment Protection when employee reported harassment to Bourough Council when he had a duty as a Manager to report complaints) *See Mills v. Evansville,* 452 F.3d 646, 648 (7th Cir. 1006)(holding that that an officer had no First Amendment protection in her speech when it was made while she was on duty, and in uniform, and the speech was made to her superiors contributing to the formation and execution of official policy). *See Green v. Bd of County Comm'rs,* 472 F.3d 794, 2007 U.S. App. Lexis 1 (10th Cir.

2007)(holding that a drug lab employee who ignored her supervisors and scheduled confirmatory drug tests she suspected were faulty was not protected by the First Amendment even though her conduct was condemned by her supervisors and not explicitly required in her day to day activities, because her acts were generally the type of activities that she was paid to do.)

In *Thompson v. District of Columbia*, 2478 F.Supp. 2d  5 (D.D.C. March 20, 2007), the Court held that a government employee's speech was not protected by the First Amendment when it occurred in the course of plaintiff's official duties as an auditory and security officer and "even if the speech was outside the bound of the plaintiff's job description, his speech was as a government employee and related to his professional responsibilities." Id at 7-8.  The Court found that even if plaintiff's speech was outside the bounds of his job description or assignments, his speech was as a government employee and related to his professional responsibilities, as opposed to his thoughts as a private citizen" *Id.* at 8.  More recently in *Williams v. District of Columbia,* 537 F. Supp. 2d 141 (D.D.C. 2008), the Court also concluded that the plaintiff "did not speak as a citizen" when she testified before D.C. Council because and her job duties and responsibilities as Chief with the Department of Health required her to provide findings to senior executive personnel in the District government  and attend hearings. *Id.* at 151-152.

Plaintiff's own averments conclusively establish that his speech was related to his professional responsibilities as Chief of Staff of DDOT.  Plaintiff therefore fails to establish the first prong of the four part test- he did not speak as a private citizen   The plaintiff concedes that in his position, as Chief of Staff, he was "responsible for overseeing the *Office of Integrity and Compliance*, *Risk Management/*Emergency Preparedness, Communications, and *Administrative and Management Support Services.*" *See Complaint* at ¶15.   His responsibilities as Chief of Staff specifically included "assisting DDOT employees and management in achieving the highest

13

level of integrity in order that the agency's external customers receive reliable and efficient service". *Id.* Investigations were Plaintiff's main responsibility. *Id.* at ¶95. Plaintiff concedes that the Fort Meyer investigation was undertaken by his own subordinates, Gonzalez and Danette Walker Mincey. It was clearly Plaintiff's job responsibility as Chief of Staff to root out governmental misconduct, to ensure the integrity in DDOT's administration and to ensure DDOT's compliance with rules, regulations, and the law. Plaintiff's speech was made pursuant to his official duties as Chief of Staff overseeing DDOT's investigation of Fort Meyers.

Plaintiff concedes that he had a "duty to report" alleged violations regarding Fort Meyer. *Id.* at ¶56. Plaintiff's legal duty to report violations as a District of Columbia employee, is enumerated in 6 DMCR 1803.8 which provides that "an employee shall report directly and without undue delay to his or her agency head and to the Office of the Inspector General of the District of Columbia any information concerning conduct which he or she knows, or should reasonably know, involves corrupt or other criminal activity, or conflict of interest". *See* 6 DMCR 1803.8   Plaintiff's duty to make the speech at issue, also underscores the fact that his speech was made pursuant to his official duties, and not made as a private citizen. *See Wilburn*, *supra* (finding no First Amendment protected speech when it was undisputed that in plaintiff's position as interim OHR Director, she had a regulatory duty to identify and eliminate discriminatory practices in employment); *see Battle, supra* (finding no First Amendment protected speech when plaintiff admitted that she had a clear employment duty to ensure the accuracy and completeness of student files as well as to report any mismanagement or fraud she encountered); *see Hill, supra* (finding no First Amendment protected speech when employee had a duty as a Manager to report complaints).

14

Plaintiff's conclusory claims that his "disclosures" were "made outside of Amos's normal chain of command and exclusive of Amos's official duties as Chief of Staff for DDOT", does not 1) comport with the undisputed facts as discussed above and 2) misses the point. *See e.g.* Complaint at ¶61. The relevant inquiry is not whether disclosures were made outside of the Plaintiff's "normal" chain of command. The Court in *Williams v. District of Columbia,* 537 F. Supp. 2d 141 (D.D.C. 2008) rejected the same argument when the plaintiff claimed that her speech was protected speech because it "was not part of her regular, routine duties." *Id.* at 151. The Court stated "this argument is unavailing because an employee's speech may be pursuant to his or her official duties--and thus unprotected by the First Amendment--even where the particular duty at issue "constitute[s] an unusual aspect of the plaintiff's employment." *Wilburn*, 480 F.3d at 1150 (citing *Battle v. Board of Regents for Ga.*, 468 F.3d 755 (11th Cir. 2006)).

Every communication at issue- Plaintiff's communications to Landers, Kissal, Peter Nickles, Emeka Moneme, and OIG and the FBI, were made in his capacity as Chief of Staff to DDOT pursuant to Plaintiff's prescribed duty to report violations, and to ensure integrity in DDOT's administration and to ensure DDOT's compliance with rules, regulations, and the law. Like the speech in *Wilburn*, 452 F.3d at 648, Plaintiff's speech is not protected by the First Amendment. Under the bright line rule set forth in *Garcetti*, because the Plaintiff's speech was made in the course of her duties and not as a private citizen, his communications enjoy no First Amendment protection, and dismissal is appropriate.

## 2. Plaintiff Did Not Speak on a Matter of Public Concern.

Plaintiff's own allegations conclude that he did not speak on a matter of public concern. Plaintiff's own averments establish that 1) he personally informed USDOT's FHWA that DDOT was unable to meet its DBE goal and 2) Fort Meyer acknowledged its failure to meet its DBE

goal and requested a waiver of DBE compliance.  Under federal regulations 49 C.F.R. Part 26,

Plaintiff, as Chief of Staff, knew or should have known that there was no violation of the law by

Fort Meyer or the District of Columbia because both federal law and District of Columbia law

permit waivers of the DBE requirement (see ¶ D(1), discussed herein), and thus, there was no

issue of public concern.

Plaintiff unequivocally did not speak a citizen on a matter of public concern with respect

to his speech to OIG.  Plaintiff essentially concedes that he did not provide details to OIG's

Assistant Inspector General because they "would not offer any protection against retaliation". *Id.*

at ¶¶64-70.  Plaintiff fails to indicate what, if anything was discussed with OIG, other than

discussions regarding guarantees of confidentiality and non-retaliation, which they could not

provide. *Id.*   Plaintiff's discussions with OIG in an effort to secure his own guarantee of

confidentiality to prevent retaliation against him, are personal in nature and are not matter of

public concern.  See *Connick v. Myers*, 461 U.S. 138 (1983)(holding that an employee's internal

work place grievances were a matter of personal interest and not public concern).

### 3. The Governments' Interest Outweighs the Plaintiff's Interests With Respect to His Speech,

As previously stated, "[s]upervisors must ensure that their employees' official

communications are accurate, demonstrate sound judgment, and promote the employer's

mission," *Garcetti*, 547 U.S. at 422-423.  "The First Amendment does not prohibit managerial

discipline based on an employee's expressions made pursuant to official responsibilities," *Id*. at

423.  In that vain, Plaintiff has also failed to establish the second prong of the four part test with

respect to his speech before the FBI- his First Amendment interest is not outweighed by the

District of Columbia's interest of promoting cooperative working relationship committed to the efficacious investigation of misconduct in government service.

The District of Columbia has a comprehensive personnel system with strict regulations relating to the reporting of corruption, criminal activity or conflicts of interest by employees.  As 6 DCMR 1803.8  provides, "an employee shall report directly and without undue delay to his or her agency head and to the Office of the Inspector General of the District of Columbia any information concerning conduct which he or she knows, or should reasonably know, involves corrupt or other criminal activity, or conflict of interest".  The regulations are drafted to allow the agency head and the OIG to initiate an investigation into matters that involves criminal activity, corruption, or conflict of interest to determine whether misconduct has occurred.

Assuming arguendo, even if Plaintiff reasonably knew that there was misconduct, his disclosures should have been directed to the two agencies mandated to handle the matter: his agency head and OIG with agency approval, not the FBI.  While these regulations do not prohibit District employees from contacting the FBI, the regulations provide a comprehensive scheme to allow the District of Columbia to appropriately root out misconduct when an employee brings the matter to its attention.

Furthermore, Plaintiff, as Chief of Staff, acknowledges that he was the number two person under the Director. See Complaint at ¶14.  The Chief of Staff position requires a special degree of trust, confidence, loyalty, and cooperation. "High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superior's policies,  and perceived by the public as sharing their superiors' aims." *Hall v. Ford,* 856 F.2d 255, 263 (D.C. Cir. 1988).  As the Court explained in

17

*Rankin v. McPherson,* 483 U.S. 378, 388, (1987), a court must consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact  on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.*

According to Plaintiff, Plaintiff advised the Director and agency head, Emeka Moneme, of the alleged misconduct on December 5, 2007.  Mr. Moneme acted promptly by holding internal agency meetings regarding Fort Meyer's contract on December 12, 2007, the day after receiving a memo from Danette Walker- Mincey, Chief of the Integrity and Compliance Unit. *See* Complaint at ¶¶87-90.  Instead of allowing DDOT's investigative process to work to determine if there was a violation of the law, Plaintiff immediately went to OIG without Director approval and completely short-circuited the District's policy under 6 DCMR 1803.8  by contacting the FBI. *See, e.g., Tyler v. City of Mountain Home,* 72 F.3d 568, 570 (8th Cir. 1995) (finding that a police department permissibly demoted a sergeant for sending a confrontational letter to another police department on official letterhead without first clearing the letter with the chief of police, as required by police department policy).

Plaintiff's unreasonable actions were disruptive to the District's legitimate regulatory scheme designed to allow the District of Columbia to appropriately root out corruption, it served to divert attention away from the Director/ agency head's ongoing investigation, and ultimately served to undermine the cooperative working relationships at DDOT and most importantly between the Director and his Chief of Staff, which was vital to the proper administration of the agency.  Plaintiff's complaint is replete with references of interagency personnel disputes, almost all of which he was notably involved. *See* Complaint, generally.  Plaintiff's actions served to

further undermine the cooperative working relationships in the agency. The Plaintiff's interests

in speech is not outweighed by the District comprehensive scheme and policy of promoting

cooperative working relationships committed to investigating allegations of misconduct in the

District.   Moreover, Plaintiff's speech, which did not evidence any reasonable belief of

unlawfulness, had a detrimental impact on DDOT's administration.


**4. Plaintiff Has Not Alleged Any Adverse Action Causally Related to the Alleged Exercise of His First Amendment Rights with the FBI**

To the extent this Court finds that Plaintiff's meeting with the FBI was made while

Plaintiff was acting as a private citizen, Plaintiff has failed to demonstrate that there was a causal

connection between his alleged speech to FBI and any adverse action.  Plaintiff's complaint is

notably silent as to whether any superior was even aware of this meeting with FBI. *See*

Complaint, generally.  To establish a violation of the First Amendment, Plaintiff must

demonstrate that the employee's speech was a substantial or motivating factor for the denial of a

right or benefit.*See Garcetti*, supra.  Plaintiff's complaint woefully fails to demonstrate that there

was any action taken against him because of his meeting with the FBI.   Based on the lack of an

adverse action or any evidence of a causal link between Plaintiff's speech before the FBI and his

termination, plaintiff's First Amendment claims should be dismissed on that basis as well.


**5.   Plaintiff Has Not Alleged Any Adverse Action Taken By Peter Nickles**

Plaintiff's complaint states that he was terminated by Emeka Moneme yet notably lacks

any allegations that Peter Nickles, former counsel to the Mayor, took any adverse action against

him. *See* Complaint, generally. Not only has plaintiff failed to identify any speech for which he is entitled to First Amendment protection, he has failed to plead an adverse action taken by Peter Nickles causally related to the alleged exercise of his First Amendment Rights. *See Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), holding a public employee must show an "adverse personnel action," such as a discharge or demotion, to support a claim of retaliation based on a protected activity. Although actions short of termination may constitute adverse employment actions within the meaning of the statute, "not everything that makes an employee unhappy is an actionable adverse action." *See Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir. 1997). *See also, Bechtel v. City of Belton*, 250 F.3d 1157, 1162 (8th Cir. 2001); *Lybrook v. Members of Farmington Mun. School Board of Educ.,* 232 F.3d 1334, 1339-41 (10th Cir. 2000); *Pierce v. Texas Dep't of Criminal Justice*, 37 F.3d 1146, 1149-50 (5th Cir. 1994).

Plaintiff's allegations regarding Peter Nickles simply do not constitute an actionable injury under the First Amendment. Plaintiff's complaint alludes to acrimonious discussions with Peter Nickles in their second meeting ( "I do not make such commitments on a whim for employees that are in jeopardy"), but such verbal comments are insufficient to constitute an adverse action. *See Complaint* at ¶81 C*ompare Cf. Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (finding that a more burdensome promotion requirement is an actionable injury). "The federal courts cannot be wheeled into action for every workplace slight, even one that was possibly based on protected conduct." *Taylor v. FDIC,* 132 F.3d 753, 765 (D.C. Cir. 1997); *see also, Nunez v. City of Los Angeles*, 147 F.3d 867, 874-75 (9th Cir. 1998) (bad-mouthing and verbal threats are not adverse actions, i.e. First Amendment violations).

6.  **Plaintiff May Not Proceed Against the District Under 42 U.S.C. § 1983 For Any Alleged Custom Policy or Practice and/or Acts Committed by Peter Nickles**

Plaintiff cannot pursue his claim pursuant to 42 U.S.C. § 1983, as he has failed to plead sufficient facts to support municipal liability against the District.  42 U.S.C. § 1983, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or cause to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Municipal liability under 42 U.S.C. § 1983 is severely limited.  *See Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 690 (1978).  Municipal liability results only when the municipality itself can be directly charged with fault for an unconstitutional deprivation. *See Wilson v. Lang*, 526 U.S. 603, 609 (1999); *Conn v. Gabbert*, 526 U.S. 286, 290 (1999); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1985); and *Baker v. McCollan*, 443 U.S. 137, 146-47 (1979), holding courts must address the threshold issue in any action brought under § 1983: "whether the plaintiff has alleged the deprivation of an actual constitutional right at all."  Therefore, municipal liability results only when the policy or custom fairly attributable to the municipality is the "moving force" behind the particular constitutional violation.  *See Polk County v. Dodson*, 454 U.S. 312, 326 (1981) (citing *Monell*, 436 U.S. at 694).

Alternatively, the District acknowledges that an individual's actions may give rise to municipal liability where the individual has "final policymaking authority [under] state law." *Triplett*, 108 F.3d 1450,1453 (D.C. Cir. 1997)(quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)). Notably  the court in *Banks v. District of Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005), concluded that the Director of the D.C.

Department of Mental Health was a final policymaker under District law because she was responsible for the "'general direction and supervision'" of the administration, "promulgate[d] rules to run [her] department" and exercise[d] "vast responsibilities and expansive authority[,]" including making personnel decisions. *Id.* at 91. Here, Plaintiff's complaint acknowledges that Peter Nickles is the former General Counsel to the Mayor. *See* Complaint, generally. The Plaintiff's complaint notably lacks any allegations that Peter Nickles was a final policymaker responsible for the direction or supervision of DDOT or had personnel authority over DDOT. *See* Complaint, generally.

Plaintiff fails to allege that his injuries were the result of any District custom, policy or practice and/or that Peter Nickles was a final policymaker responsible for his alleged injuries. *See* Complaint, generally. Therefore, plaintiff's claims against the District pursuant to 42 U.S.C. § 1983 fail as a matter of law.

### C.    Defendants Emeka Moneme and Peter Nickles Are Entitled To Qualified Immunity.

The purpose of qualified immunity is to protect governmental employees against insubstantial lawsuits that have the following societal costs: l) expenses of litigation; 2) diversion of official energy from pressing public issues; 3) deterrence of able citizens from acceptance of public office; and 4) the possibility that the fear of being sued will dampen the ardor of all but the most resolute individuals. *Harlow v. Fitzgerald*, 457 U.S. 800, 8l4 (l982). Qualified immunity shields officials, such as defendants Moneme and Nickles, from liability as long as their action could reasonably have been thought to be consistent with the First Amendment rights they are alleged to have violated. *See Boyce v. Andrew*, 510 F.3d 133 (11th Cir. 2007)(finding that supervisors were entitled to qualified immunity in a First Amendment case).

In *O'Donnell v. Barry*, 148 F.3d 1126, 1132 (1998) the District of Columbia Circuit found that Metropolitan Police Department's former Chief of Police, Larry Soulsby, was entitled to qualified immunity in a First Amendment case where the Chief demoted the plaintiff, his Deputy Chief of Police, after the plaintiff sent a letter to the Washington Post intimating misconduct at MPD, criticizing the Chief of Police, and indicating that the Chief of Police was not credible. *Id.* The Circuit determined that "it is by no means clear whether that letter is legally protected, so that any unlawfulness in Soulsby's acts in (allegedly) securing O'Donnell's demotion was not "apparent." Soulsby is thus entitled to qualified immunity." *Id.* at 1142.

Plaintiff has similarly made disclosures that were not clearly protected by the First Amendment. *See* Complaint, generally, see record herein. Defendant Moneme reasonably, and consistent with the law, terminated Plaintiff from his position as his personal Chief of Staff after plaintiff made disclosures without agency approval that were not clearly protected by the First Amendment. Because defendant Moneme believed in good faith that he was exercising the personnel authority given to him to terminate the Plaintiff, the facts pled by the plaintiff are insufficient to support a finding that defendants Moneme acted in any unreasonable manner in making personnel decisions that resulted in Plaintiff's termination. Accordingly, Moneme is qualifiedly immune from suit.

 For the same reasons, defendant Nickles is also qualifiedly immune from suit. Furthermore, Plaintiff acknowledges that Peter Nickles 1) encouraged him to report the alleged misconduct to OIG and 2) took no adverse action such as a discharge or demotion against him. *See* Complaint, generally. As such, all the described actions and/or lack of actions make Peter Nickles qualifiedly immune from suit and liability under the First Amendment. *See Complaint* at ¶¶49-63. Plaintiff has failed to pled any facts to show that defendants Emeka Moneme and Peter

Nickles acted unreasonably and violated any clearly established right under the First Amendment.

**D.** **Plaintiff's Complaint Fails to State a Claim under the Whistleblower Protection Act**

    **1.** **Plaintiff's Facts Do Not Demonstrate a Violation of the Law, Gross Misuse or Waste of Public Resource or Abuse of Authority**.

Under the Whistleblower Protection Act (WPA), "the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal. *See* D.C. Official Code § 1-615.51. The WPA defines the term "protected disclosure" as follows

> "any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences "gross mismanagement, gross misuse or waste of public resources or funds, abuse of authority in connection with the administration of a public program or the execution of a public contract, a violation of a federal, state, or local law, rule or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or a substantial and specific danger to the public health and safety."

D.C. Official Code § 1-615.52(6).

Disclosure means "to bring into view by uncovering" and relates to the underlying conduct, rather than to the asserted fact of its unlawfulness, in order for the disclosure to be protected by the WPA. *Meuwissen v. Dep't of the Interior*, 234 F.3d 9, 13-14 (Fed. Cir. 2002); *Huffman v. Office of Personnel Management*, 263 F.3d 1341, 1350 (Fed. Cir. 2001). Furthermore, disclosure of illegal conduct requires identifying a specific law, rule or regulation that was violated, not merely asserting one's belief that a statute was erroneously interpreted. *Meuwissen*, 234 F.3d at 13-14.

24

The main thrust of Plaintiff's complaint is that there were violations of federal regulations related to Fort Meyer Construction Company ("Fort Meyer"), a District contractor, who is alleged to have fraudulently qualified for and maintained Disadvantaged Business Enterprise ("DBE") status with the District of Columbia. *See* Complaint, generally.  Plaintiff, in fact, only identifies one regulation that was allegedly violated: 49 C.F.R. 26. Id. at ¶¶23-26. Plaintiff's own facts, however, establish that he could not have reasonably believed that there was governmental misconduct or a violation of the law, because Plaintiff had to have known that there was broad discretion in the statutory law regarding compliance with DBE requirement. *See Coppens v. DOD,* 117 Fed. Appx.110, 112 ("An employee who knows that a regulation allows broad discretion, cannot reasonably believe that exercise of such discretion is a violation of the statute.").

Plaintiff was Chief of Staff "responsible for overseeing the Office of Integrity and Compliance, Risk Management/Emergency Preparedness, Communications, and Administrative and Management Support Services." *See Complaint* at ¶15.  Plaintiff acknowledged that the District was forthcoming with the USDOT's FHWA, and he, on behalf of DDOT, advised the federal government of DDOT's inability to meet its DBE goals.  Plaintiff also knew that Fort Meyer requested a waiver for its own non-compliance with its DBE goals after it attempted to comply. *Id.* at ¶¶20-22, 48.  Plaintiff knew, or should have known, given the letter he sent to the federal government and his high ranking position as Chief of Staff, that the federal governments' and the District governments' DBE programs are extremely flexible, so non-compliance alone, does not establish a violation of the law or misconduct.  As Plaintiff correctly notes, the governing federal regulations related to DBE are found at 49 C.F.R. Part 26. *Id.*

Federal law explicitly authorizes waivers for jurisdictions such as the District of Columbia

which cannot meet their DBE goals. See  49 CFR 26.15.  49 C.F.R  26.15 provides as follows:

49 CFR 26.15

§ 26.15 How can recipients apply for exemptions or waivers?

(a) You can apply for an exemption from any provision of this part. To apply, you must request the exemption in writing from the Office of the Secretary of Transportation, FHWA, FTA, or FAA. The Secretary will grant the request only if it documents special or exceptional circumstances, not likely to be generally applicable, and not contemplated in connection with the rulemaking that established this part, that make your compliance with a specific provision of this part impractical. You must agree to take any steps that the Department specifies to comply with the intent of the provision from which an exemption is granted. The Secretary will issue a written response to all exemption requests.

(b) You can apply for a waiver of any provision of Subpart B or C of this part including, but not limited to, any provisions regarding administrative requirements, overall goals, contract goals or good faith efforts. Program waivers are for the purpose of authorizing you to operate a DBE program that achieves the objectives of this part by means that may differ from one or more of the requirements of Subpart B or C of this part. To receive a program waiver, you must follow these procedures:

(1) You must apply through the concerned operating administration. The application must include a specific program proposal and address how you will meet the criteria of paragraph (b)(2) of this section. Before submitting your application, you must have had public participation in developing your proposal, including consultation with the DBE community and at least one public hearing. Your application must include a summary of the public participation process and the information gathered through it.

(2) Your application must show that --

(i) There is a reasonable basis to conclude that you could achieve a level of DBE participation consistent with the objectives of this part using different or innovative means other than those that are provided in subpart B or C of this part;

(ii) Conditions in your jurisdiction are appropriate for implementing the proposal;

(iii) Your proposal would prevent discrimination against any individual or group in access to contracting opportunities or other benefits of the program; and

(iv) Your proposal is consistent with applicable law and program requirements of the concerned operating administration's financial assistance program.

49 C.F.R  26.15.  Federal DBE regulations derive their statutory authority from the

Transportation Equity Act for the 21st Century or TEA-21, which authorizes the use of race-

and sex-based preferences in federally funded transportation contracts. *See Western States*

*Paving Co., Inc. v. Washington State Department of Transportation*, 407 F.3d 983 (9th Cir.

2005). The Ninth Circuit in *Western States* explained the federal DBE program:

> The regulations do not establish a nationwide DBE program centrally administered by
> the USDOT. Rather, the regulations delegate to each State that accepts federal
> transportation funds the responsibility for implementing a DBE program that comports
> with TEA-21. The regulations accordingly explain that the 10% DBE utilization
> requirement established by the TEA-21 statute is merely "aspirational" in nature. *Id.* §
> 26.41(b). The statutory goal "**does not authorize or require recipients to set overall or
> contract goals at the 10 percent level, or any other particular level, or to take any
> special administrative steps if their goals are above or below 10 percent." *Id.* §
> 26.41(c). . .
> The TEA-21 regulations explicitly prohibit the use of quotas. 49 C.F.R. § 26.43(a).
> Moreover, where race-conscious contracting goals are used, prime contractors can
> meet that goal either by subcontracting the requisite amount of work to** DBEs **or by
> demonstrating good faith efforts to do so.** *Id.* § **26.53(a). A State likewise cannot be
> penalized by the federal government for failing to attain its** DBE **utilization goal as
> long as it undertakes good faith** compliance **efforts.** *Id.* § **26.47(a). TEA-21 therefore
> provides for a flexible system of contracting goals that contrasts sharply with the
> rigid quotas invalidated in** *Croson. See Sherbrooke Turf, Inc.*, 345 F.3d at 972 ("the
> [TEA-21] DBE program has substantial flexibility")

*Western States Paving Co., Inc.*, 407 at 989-995(emphasis added).  Similarly, District of

Columbia law also authorizes waivers and flexibility for contractors who cannot meet their DBE

goals. D.C. Official Code § 2-218.49  provides as follows:

> § 2-218.49. Other procedures and programs

> (a) The Mayor shall establish policies and procedures to maximize the
> participation of local, small, and disadvantaged business enterprises in the contracting
> and procurement processes, including:

> (1) A procedure whereby an agency may waive bid security requirements on **contracts**

in excess of $ 100,000, where the **waiver** is appropriate to achieve the purposes of this subchapter; and

   (2) A policy whereby an agency shall make advance payments to a certified contractor, where the payments are necessary to achieve the purposes of this subchapter.

(b) The Mayor may establish a pilot set-aside program for small business enterprises with gross revenues of $ 5 million or less.

D.C. Official Code § 2-218.49.

     A waiver of DBE requirement is permissible under federal law and District law- it is not a rigid quota program.  No reasonable person in Plaintiff's position as Chief of Staff could believe that Fort Meyer's contract with the District was evidence of gross mismanagement, gross misuse or waste of public resources, fraud or any violation of the law.  As such, his alleged "disclosures" to Landers, Kissal, Peter Nickles, Emeka Moneme, and OIG[1] and the FBI, were not protected disclosures under the WPA as they revealed no unlawfulness.

    **2. Plaintiff Has Not Alleged Any Prohibited Personnel Action Taken By Peter Nickles or Any Prohibited Personnel Actions Based on Disclosures to the FBI**

     As the District of Columbia Court of Appeals stated in *Zirkle v. District of Columbia*, 820 A.2d 1250, the District of Columbia's seminal case under the WPA, "the WPA requires an employee to demonstrate "by a preponderance of the evidence that an activity proscribed by § 1-615.53 was a contributing factor in the alleged prohibited personnel action against [the] employee." *Id*. at 1260. *See also* D.C. Code § 1-615.54 (b).  The Plaintiff does not alleged that any facts that establish that Peter Nickles engaged in a prohibited personnel action as a "supervisor" under the WPA. The WPA states as follows:

---

[1] Plaintiff fails to adduce any facts regarding his discussions with OIG that would qualify as speech related to a matter of public concern or a protected disclosure. Plaintiff declined to speak to OIG because they could offer him no assurances of non-retaliation.

"Prohibited personnel action includes but is not limited to: recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail; referral for psychiatric or psychological counseling; failure to promote or hire or take other favorable personnel action; or retaliating in any other manner…."

D.C. Code § 1-615.52 (a) (5). The WPA also provides the following:

A supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order.


D.C. Code 1-615.53. Prohibitions [Formerly § 1-616.13] The WPA defines as supervisor as

"an individual employed by the District government who meets the definition of a "supervisor" in § 1-617.01(d) or who has the authority to effectively recommend or take remedial or corrective action for the violation of a law, rule, regulation or contract term, or the misuse of government resources that an employee may allege or report pursuant to this section, including without limitation an agency head, department director, or manager.

D.C. Code § 1-615.52 (a) (5).

Plaintiff does not alleged that any facts that demonstrate that Peter Nickles engaged in a prohibited personnel action as a supervisor, as required by law.  Plaintiff claims that Mr. Nickles referenced that his job was "in jeopardy" but does not alleged that Peter Nickles threatened him, had the authority to terminate him, or take any personnel action against him. *See* record herein.  Plaintiff does not allege that Mr. Nickles had the authority to recommend or take remedial or corrective action- the facts alleged by plaintiff indicate that Mr. Nickles referred the Plaintiff to the OIG, who was empowered to provide remedial action. *Id.*  The complaint lacks any allegations that Peter Nickles, former General Counsel to the Mayor, had any personnel authority over DDOT or its Chief of Staff as a supervisor. *See* Complaint, generally.

Furthermore, to the extent the Court deems that the plaintiff made disclosures under the WPA to the FBI, as previously stated, Plaintiff has failed to demonstrate under *Zirkle* that there

was a causal connections between his alleged speech to the FBI and any adverse action. *See*

*Zirkle v. District of Columbia*, 820 A.2d 1250, 1260 (2003); *See* Complaint, generally.

Plaintiff's complaint is conspicuously silent as to whether any superior was even aware of this

meeting with the FBI. *Id.* The Plaintiff's failure to establish a prohibited personnel action based

on speech to the FBI precludes recovery on this basis as well.

      WHEREFORE, for all the foregoing reasons, the defendants respectfully request this

Court to dismiss plaintiff's Complaint.

                       Respectfully submitted,

                       PETER J. NICKLES
                       Acting Attorney General for the District of
                       Columbia

                       GEORGE C. VALENTINE
                       Deputy Attorney General, Civil Litigation
                       Division

                         /s/   Ellen Efros
                       ELLEN EFROS [250746]
                       Assistant Deputy Attorney General, Civil Litigation
                       Division

                      /s/   Leah Taylor
                       LEAH BROWNLEE TAYLOR [488966]
                       Assistant Attorney General
                       441 4th Street, N.W.
                       Sixth Floor South
                       Washington, D.C. 20001
                       (202) 724-7854; (202) 727-6295
                       leah.taylor@dc.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————————————————— )
| |
**STEPHEN P. AMOS** )
**8959 Sycamore Ridge Road** )
**Fairfax Station, VA 22039** )
)
    **Plaintiff,** )
)
    **v.** )
)   **Civil Action No. 08-00554 (RMC)**
**THE DISTRICT OF COLUMBIA** )
**John A. Wision Building** )
**1350 Pennsylvania Avenue, N.W.** )
**Washington, DC 20004** )
)
**And** )
)
**EMEKA C. MONEME** )
**Director, District Dept. of Transportation** )
**1213 Fern Street, N.W.** )
**Washington, D.C. 20012** )
)
**And** )
)
**PETER J. NICKLES, ESQ.** )
**Interim Attorney General,** )
**District of Columbia** )

## <u>ORDER</u>

    Upon consideration of the defendants Emeka Moneme, Peter Nickles , and the District of

Columbia's Motion to Dismiss Plaintiff's Amended Complaint, plaintiff's response thereto, if

any, and the record herein, it is this by the Court this _____ day of _____, 2008,

    ORDERED:   that the Motion is GRANTED for the reasons set forth in the defendants'

motion; and it is

FURTHER ORDERED:   that plaintiff's Complaint is DISMISSED against all named

defendants.

_____

JUDGE, United States District Court for the District of
Columbia