**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **STEPHEN P. AMOS** | ) |
| **8959 Sycamore Ridge Road** | ) |
| **Fairfax Station, VA 22039,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE DISTRICT OF COLUMBIA** | ) |
| **John A. Wilson Building** | ) |
| **1350 Pennsylvania Avenue, N.W.** | ) |
| **Washington, D.C. 20004,** | ) |
| | )   **Civil Action No. 08-00554 (RMC)** |
| **and** | ) |
| | ) |
| **EMEKA C. MONEME** | ) |
| **Director, District Dept. of Transportation** | ) |
| **1213 Fern Street, N.W.** | ) |
| **Washington, D.C. 20012,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **PETER J. NICKLES, ESQ.** | ) |
| **Interim Attorney General, District of Columbia,** | ) |
| **9341 Cornwell Farm Rd.** | ) |
| **Great Falls, VA 22066,** | ) |
| | ) |
| **Defendants.** | ) |

_____)

**FIRST AMENDED COMPLAINT FOR EQUITABLE AND MONETARY RELIEF**
**AND DEMAND FOR JURY TRIAL**

**Introduction**

1.      This is a Civil Action brought by plaintiff Stephen Amos ("Amos"), the former

Chief of Staff of the District of Columbia Department of Transportation ("DDOT") until his

unlawful termination, effective January 28, 2008, against the District of Columbia ("D.C."),

DDOT Director Emeka C. Moneme ("Moneme"), and Interim Attorney General Peter J. Nickles ("Nickles") (collectively, "Defendants").

2.      Amos' subordinate conducted an investigation which ultimately determined, *inter alia*:  A) that DDOT had qualified Fort Myer Construction Corporation ("Fort Myer") as a Disadvantaged Business Enterprise ("DBE"); B) that since being released from its debarment, Fort Myer knowingly and fraudulently qualified for Federal Highway Administration ("FHWA") funds by entering into a subcontract with Peake Construction Company ("Peake") and using Peake as the certified DBE; C) that Peake is a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified as a DBE contractor by DDOT; and D) that neither Fort Myer nor the designated subcontractors were actually performing the work.

3.      Amos reported these investigation results and suspected violations to various officials, including, but not limited to Moneme and Nickles, the then-General Counsel to the Mayor of the District of Columbia.

4.      Amos' disclosure led to Moneme's retaliation against Amos, by threatening Amos and stripping Amos of his professional duties and responsibilities.

5.      Amos made his disclosures to Nickles as well.  At first Nickles encouraged Amos to come forward with the results of the investigation, but Amos wanted to be assured that he and his subordinates would not suffer any retaliation.  Nickles did not advise or assure Amos that Amos had a right to be protected from any retaliation as a result of Amos' obviously protected disclosures.

6.      The investigation of DDOT officials and their relationship with Fort Myer and Peake, and Amos' report of the investigation results and possible malfeasance to the DDOT

Director's Office, to the Executive Office of the Mayor, to the Office of the Inspector General ("OIG") and to the Federal Bureau of Investigation ("FBI") led Moneme to terminate Amos' employment in violation of the District of Columbia Whistleblower Protection Act, and federal law, 42 U.S.C. § 1983.

### Jurisdiction and Venue

7.      This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331 since there is a federal question that arises under the First Amendment to the Constitution, and the laws of the United States, specifically 42 U.S.C. § 1983. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332 since the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

8.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391, because Defendants' unlawful actions were taken within the District of Columbia in this judicial district.

9.      Pursuant to D.C. Code §§ 1-615.54(a) and 12-309, Amos provided Notice to the Mayor of his claims on February 21, 2008.

### Parties

10.      Plaintiff Amos was employed by the DDOT as the Chief of Staff to DDOT Director Moneme from July 2007 until Amos was unlawfully terminated, effective January 28, 2008.  Amos is a resident of the Commonwealth of Virginia.

11.      Defendant D.C., although designated pursuant to Article I, Section 8 of the Constitution as the capital of the United States, is a municipal corporation which governs D.C.

pursuant to The District of Columbia Self-Government and Governmental Reorganization Act, P.L. No. 93-108, 87 Stat. 774, D.C. Code § 1-211.  DDOT, Amos' former employer, is an agency of D.C., the functions of which include, among other matters, managing and maintaining transportation infrastructure for D.C.  DDOT is headquartered at Frank D. Reeves Municipal Center, located at 2000 14th Street, N.W., 6th Floor, Washington, D.C.  20009, where most of Defendants' unlawful actions toward Amos were taken.

12.    Defendant Moneme is the Director of DDOT, and as such, is its chief executive officer, with final decision making authority over the acts that underlie this Complaint.  Moneme is sued here in his official and his individual capacities.  Moneme's unlawful actions toward Amos were taken at locations within D.C., including, but not limited to, the DDOT headquarters.  Moneme is a resident of the District of Columbia.

13.    Defendant Nickles is the Interim Attorney General for D.C.  At various times relevant to this complaint, Nickles was also serving as the General Counsel to the Mayor of the District of Columbia.  Nickles is sued here in is official and his individual capacities.  Nickles's unlawful actions toward Amos were taken at locations within D.C., including, but not limited to, the Executive Offices of the Mayor.  Upon information and belief Nickles is or is soon to be a resident of the District of Columbia.

**Factual Allegations**

Amos' Arrival at DDOT

14.    On or about July 16, 2007, DDOT Director Moneme hired Amos to the position of Chief of Staff in the Management Supervisory Service.  Amos was the number two person in the office and reported directly to Moneme.

15.    Amos was responsible for overseeing the Offices of Integrity and Compliance, Risk Management/Emergency Preparedness, Communications, and Administrative and Management Support Services.  His responsibilities included assisting DDOT employees and management in achieving "the highest level of integrity in order that the agency's external customers receive reliable and efficient service."

16.    As of July 16, 2007, when Amos began as Chief of Staff, Amos was the fourth (4th) Chief of Staff for DDOT since the new administration came into office on January 1, 2007.

17.    As soon as Amos arrived at DDOT, he found the office in significant disarray, and in clear need of his expertise in assessing and resolving problems within the agency.


<u>Amos First Learns of Suspicious Relationships at DDOT</u>

18.    On or about July 23, 2007, Amos first learned about Fort Myer because of a July 6, 2007 report to the Office of Integrity and Workforce Relations.  The report disclosed that a street had collapsed due to the use of suspected low-grade asphalt on a contracting job.

19.    During the investigation of the incident, Amos learned that approximately five and a half years earlier, Fort Myer had been convicted of bribing a number of DDOT employees in a bid-steering and bid-rigging investigation conducted by the FBI.  As a result, Fort Myer had been debarred as a recipient of federally funded construction contracts for a period of eighteen months.

20.    Approximately one month later, on or about August 24, 2007, Ronnie Edwards ("Edwards"), the Chief EEO Officer for DDOT, requested that Amos sign a letter to Mark Kehrli ("Kehrli"), Division Administrator for the U.S. Department of Transportation ("USDOT").

21.     The letter stated that DDOT was not meeting its 2007 DBE goal of allocating twenty-six (26) percent of funds to DBE-qualified contractors under 49 C.F.R. Part 26.

22.     Since DDOT receives approximately ninety (90) percent of its funding from the USDOT's FHWA, approximately one hundred eighty million ($180,000,000) dollars per year, the FHWA requires that DDOT dedicate a minimum of ten (10) percent of federal funds for contracts with DBE-qualified businesses.

23.     The letter to Kehrli, which was drafted by Edwards, stated that DDOT had failed meet its DBE goals in accordance with 49 C.F.R. Part 26 because of mathematical errors in the previous assessments and improper DBE goal-setting by the DDOT.

24.     Edwards wanted to reduce DDOT's goals to allocate eleven (11) percent of funds to the DBE-qualified contractors, which was in accordance with what DDOT had actually been doing.

25.     Because Moneme was absent, Amos agreed to sign the letter to Kehrli in reliance on statements made by Francisco Edwin Gonzalez ("Gonzalez"), EO Specialist, and Amy Vance, both of whom Amos trusted.

26.     In November 2007, Amos fired Edwards from DDOT after receiving numerous harassment complaints about him and for ethical violations.

27.     Upon information and belief, Amos' termination of Edwards irritated various D.C. government officials.  Edwards had been hired at DDOT by Dan Tangerlini ("Tangerlini"), the former Director of DDOT and current D.C. City Administrator.  Edwards was considered to be one of Tangerlini's "inner circle," along with Moneme and Nickles.

<u>Gonzalez Tells Amos of the Unlawful Contracts</u>

28.    On or about December 3, 2007 (after Edwards had been fired by Amos for various ethical violations), Gonzalez revealed to Amos that Gonzalez was concerned about improprieties in the relationship between DDOT officials, Fort Myer, Peake and Pessoa Construction Company ("Pessoa").

29.    Gonzalez alluded to the close relationship between Fort Myer, Edwards and Tangerlini.

30.    Gonzalez added that Fort Myer was a very large political contributor to Mayor Fenty's campaign and historically has been a very politically powerful company.

31.    Gonzalez articulated to Amos that because of its debarment up until the previous year, Fort Myer had been prohibited from access to federal funds or work on projects that included federal funds.

32.    Gonzalez believed that since the end of its debarment, Fort Myer had been working closely with DDOT officials to fraudulently obtain USDOT funding for its contracts.

33.    This concern was also communicated to Amos by his subordinate, Danette Walker-Mincey ("Walker-Mincey"), the Chief of the Integrity Compliance Unit at DDOT at that time.

34.    Walker-Mincey stated that during this period of debarment, the previous agency Ethics Officer communicated that Fort Myer was given frequent and unprecedented inappropriate access to then-Director of DDOT, Dan Tangerlini.

35.    At the time, Walker-Mincey had been employed with the Attorney General's General Counsel assigned to DDOT.

36.    Walker-Mincey further stated that she had frequently counseled Tangerlini as to the inappropriateness of the relationship with Fort Myer.

37.    Fort Myer's close relationship with DDOT officials, particularly the Director of DDOT, did not change when Tangerlini became the City Administrator, leaving DDOT, and when Moneme was appointed Director of DDOT.

38.    As Fort Myer is not a qualified DBE, it formed relationships with subcontractors, such as Peake, who were qualified as DBEs.

39.    Not incidentally, Edwards, who was appointed by Tangerlini, had been in charge of qualifying contractors as DBEs for DDOT.  Edwards qualified Fort Myer as a DBE after the period of Fort Myer's debarment.

40.    Moreover, in conducting a site visit to the Foxhall Road, NW Safety Improvements Road Project on August 27, 2007, Gonzalez had discovered that Peake was not actually performing the work at the site.  Rather, the work was being performed by a third party, DEN United – an entity DDOT had not authorized to be present on the work site.

41.    Thus, Fort Myer was not in compliance with the 49 C.F.R. Part 26 requirements.

42.    Gonzalez told Amos that he believed Peake is a shell company because it has no assets, no equipment, no trucks, and no office, and its CEO is Parney Jenkins, Sr. ("Jenkins").

43.    Jenkins is a former DDOT official who was convicted of taking bribes from Fort Myer.

44.    When Amos asked Gonzalez why he had not raised these issues earlier, Gonzalez replied that Edwards had prevented him from doing so.  After Edwards was fired, Gonzalez felt comfortable talking to Amos.

45.     The following day, on or about December 4, 2007, Amos learned that Edwards was now working for Fort Myer and was acting as a facilitator/consultant to ensure that Fort Myer secured DDOT contracts.  Edwards had been seen at DDOT headquarters working for Fort Myer even though Edwards had only recently been fired from DDOT by Amos.


<u>Gonzalez Gives Amos a Formal Memo Regarding the Unlawful Contracts</u>

46.     Later that day, on or about December 4, 2007, Gonzalez submitted a memo to Amos describing the problems with the Foxhall Road, NW Safety Improvements Project and a second project, the South Capitol Street, Near Term Improvement Project.

47.     With regard to the South Capitol Street Project, Gonzalez said he discovered in September that Pessoa, a DBE-qualified subcontractor working for Fort Myer, had contracted sixty-two (62) percent of its work to Anchor Construction Company ("Anchor"), which was not DBE-qualified.

48.     According to Fort Myer's DBE Plan for this contract, Pessoa was to perform twenty-six (26) percent of the twenty-nine (29) percent DBE contract goal.

49.     Gonzalez determined that Pessoa was only performing ten (10) percent of the contract work.

50.     In his memo, Gonzalez further stated that a letter of noncompliance had been sent to Fort Myer in September of 2007.  Fort Myer responded that it was committed to its DBE goal as set forth in its DBE Plan and assured DDOT that it would meet its goals.  However, on November 13, 2007, Fort Myer asked for a waiver because it was unable to meet its DBE goals.

51.     Fort Myer did not request that its DBE goals be waived until after Fort Myer had already failed to meet the DBE goals.  This behavior is not consistent with the standard

procedure for requesting a waiver of DBE goals, and is evidence of bad faith at best, and at worst, of fraudulent and potentially criminal behavior.

52.    After Gonzalez's report, DDOT began an investigation into this issue regarding Fort Myer's request for a DBE waiver, but DDOT's investigation was not complete until sometime in late December 2007, or early January 2008. Amos was excluded from participation in this investigation even though his action was the reason the investigation was initiated.


<u>Amos Discloses the Unlawful Activity to DDOT Director Moneme</u>

53.    On or about December 5, 2007, Amos told DDOT Deputy Directors Ken Laden ("Laden") and Carol Kissal ("Kissal"), both jointly and separately, about the foregoing facts he learned from Gonzalez.

54.    Amos told Kissal that he planned to share this information with the OIG.

55.    Kissal became upset and stated that Tangerlini had advised her to manage these risk-related issues internally and said that it was best that the information not go outside of the Director's Office.

56.    Amos replied to Kissal that he had an obligation to disclose his concerns to the OIG.

57.    Later that same day, Moneme came to Amos' office "to talk," and Amos told Moneme about the information in Gonzalez's now-formal report.

58.    Amos further communicated to Moneme that Amos wanted to disclose the information to the OIG even though Kissal had said earlier that Amos should keep it "internal" which was her direction from Tangerlini.

59. Moneme became angry and ordered Amos to keep the information internal and "quiet" and not share it with the OIG.

60. Moneme's order contradicted Amos' duty to report the violation. DDOT's Standard Operating Policy ("SOP") regarding complaints specified that, "[i]f the matter is of such a sensitive and/or if the matter personally involves and/or implicates the Director, . . . directly or indirectly, the Chief may forward the matter directly to the Inspector General without consultation by the Director . . ." The SOP continued, "[i]f the Agency fails to act and the matter is of such an egregious manner that failing to act places the Agency and/or its ability to competently carry out its operations/mission, the Chief shall notify the appropriate District of Columbia officials in order to ensure that proper and immediate action is taken."

61. Pursuant to the SOP, Amos contacted the OIG via e-mail, without consulting Director Moneme, and scheduled a confidential meeting for December 7, 2007.

<u>Amos Discloses the Unlawful Activity to General Counsel Nickles</u>

62. On or about December 6, 2007, Amos called Nickles, General Counsel for the District of Columbia, to request a private meeting to share the foregoing information.

63. During the call, Amos relayed a brief outline of his concerns.

64. Amos was directed to come to Nickles's office in thirty minutes to meet with Nickles in person. Amos was surprised to secure a meeting so quickly and believed that Nickles made himself available for a meeting so quickly due to the importance and gravity of Amos' concerns.

65. At their meeting, Amos shared with Nickles an overview of the suspected misconduct and related to Nickles the information Gonzalez had told Amos.

66.     Amos made these disclosures outside of his normal chain of command, but pursuant to the above-referenced SOP that directed Amos to report potential criminal activity to other D.C. officials in the obvious absence of any corrective activity being taken within DDOT.

67.     Amos believed these allegations of criminal fraud among DDOT officials and DDOT contractors were "of such an egregious manner that failing to act" would compromise DDOT and "its ability to competently carry out its operations/mission."

68.     This misconduct that Amos reported included:  allegations of large and numerous financial contributions by Fort Myer's owners, family members, and employees to Mayor Fenty's campaign; DDOT officials' interventions to conceal and/or facilitate the ongoing practices of Tangerlini; bid-rigging and the steering of federally funded contracts to Fort Myer through Peake; and Edwards' likely involvement in criminal misconduct.

69.     After Amos relayed his concerns, Nickles said that Amos should report the information to the OIG's office.

70.     Amos already had an appointment set with Alfred Miller ("Miller"), Deputy Assistant Inspector General, for December 7, 2007, and Nickles encouraged Amos to brief Miller as to the more detailed aspects of Amos' concerns.


Amos Discloses the Unlawful Activity to the OIG

71.     On or about December 7, 2007, Amos and Walker-Mincey met with Leonard Odom ("Odom"), Assistant Inspector General.

72.     Amos was prepared to give a full briefing about his concerns and brought the corresponding investigative reports previously mentioned, but he and Walker-Mincey were

extremely worried about the confidentiality of the information and whether they (or their subordinates) would suffer retaliation.

73.     In order to assuage Walker-Mincey's fears, before disclosing many details, Amos asked Odom about what protection the OIG could guarantee for Amos, Walker-Mincey, and any subordinates that would be coming forward.

74.     Odom told Amos that without knowing more details, he could not guarantee that the information would remain confidential or that Amos would not be retaliated against.

75.     Amos then told Odom that he would feel more comfortable if there was a joint meeting with the FBI.

76.     Odom told Amos that he did not want to set up a meeting with the FBI until he reviewed the documents and learned more details.

77.     Odom again asked Amos and Walker-Mincey if they were concerned about retaliation, and both Amos and Walker-Mincey communicated that they felt the need for protections against retaliation for their disclosures.

78.     After some time, the Chief of Staff and General Counsel for the Inspector General came in and reiterated that they would not provide any protections against retaliation, but that they would communicate Amos' and Walker-Mincey's concerns to Nickles, and would leave the matter in Nickles' hands.  The Chief of Staff and General Counsel for the Inspector General then promised that they would contact Amos within a week to follow-up with him.

79.     When Amos and Walker-Mincey realized that the OIG would not offer any protection against retaliation, they decided not to share their concerns in further detail.

<u>Amos Again Reports the Unlawful Activity to Nickles</u>

80.     During their meeting on December 6, 2007, both Nickles and the OIG had agreed to call Amos a few days later to follow-up on the issues Amos raised during their meeting.

81.     On or about December 11, 2007, Amos contacted the OIG to follow-up on Amos' request for a letter protecting Amos and more importantly, Amos' subordinates, from retaliation for their disclosures.

82.     Miller communicated to Amos that Miller had no knowledge of any movement on the issue, but that Miller would look into it and get back to Amos.

83.     On or about December 11, 2007, Amos called Nickles's office, because Amos had yet to hear from Nickles.

84.     As he had at their earlier meeting, Amos again requested that Nickles write a letter of assurance that Amos and his subordinates would not be retaliated against before they would disclose further information.

85.     Nickles changed his attitude of helpfulness and replied that he did not have the authority to make assurances without knowing more about the situation.

86.     However, as General Counsel to the Mayor, and as a practicing attorney Nickles was aware of the D.C. Whistleblower Protection Act that affords protection from retaliation to certain employees of the city government who blow the whistle regarding legal violations.

87.     Amos emailed to Nickles a number of documents related to a very recent example of a simple internal misconduct investigation.

88.     The documents involved an investigation regarding Kathleen Penney ("Penney"), DDOT's new Chief Engineer, in which the Office of Integrity and Compliance was thwarted and could not conduct a simple fact-finding investigation.

89.     At Tangerlini's direction, Moneme counseled Amos not to pursue this matter concerning Penney.

90.     As with Amos' previous telephone call to Nickles's office, within thirty minutes of the call, Amos was directed to meet with Nickles in person, again evidencing the gravity of the situation.

91.     Once there, Nickles chastised Amos for his failure to fully disclose the matter at hand to the OIG on December 7, 2007.

92.     Amos again asked Nickles for a letter assuring that Amos and Amos' subordinates would not be retaliated against, but Nickles refused to provide one. Amos explained that he and his subordinates were concerned that they would be victims of DDOT's culture and storied history of reprisals against employees who blew the whistle on improper or even criminal conduct.

93.     Nickles did not wish to discuss any sort of assurances and emphatically stated: "I do not make such commitments on a whim for employees that are in jeopardy and no letter of assurance will be forthcoming."

94.     Amos responded that he was not aware that his position was in jeopardy, and Nickles did not respond.

95.     Upon information and belief, Amos' position was not in jeopardy, until he began reporting and disclosing the improper relationship between Fort Myer and DDOT officials.

96.     Amos made these disclosures to Nickles outside of Amos' normal chain of command and exclusive of Amos' official duties as Chief of Staff for DDOT.

<u>Amos Reports Unlawful Activity to the FBI</u>

97.     Amos left the meeting and immediately made contact with the Washington Field Office of the FBI.

98.     Amos made a full and complete disclosure of the events to date.

99.     Amos made these disclosures outside of his normal chain of command and exclusive of his official duties as Chief of Staff for DDOT.

100.    Additionally, on or about December 11, 2007, Walker-Mincey submitted a memo to the Office of the Director, which re-stated the problems in Gonzalez's December 4, 2007 memo.

101.    With regard to the Foxhall Road, NW Safety Improvements project, Walker-Mincey recommended that the Office of Integrity and Workforce Relations ascertain whether Peake is a viable company operating on D.C. contracts, whether Peake acted improperly in subcontracting out work to be performed, whether Fort Myer was aware of the problems, and whether the problem may exist in other contracts involving Peake and Fort Myer.

102.    As to the South Capitol Street, Near Term Improvement project, Walker-Mincey agreed with Gonzalez's recommendation that Fort Myer should not be awarded any new contracts until it complies with outstanding requests and can submit a valid DBE Plan that will be complied with earnestly.

<u>Moneme Threatens Amos</u>

103.    On or about the morning of December 12, 2007, Moneme held the first of a series of previously-scheduled Contract Meetings with the relevant parties present: Procurement, General Counsel, Civil Rights, Office of Integrity, and Amos, the Chief of Staff.

104.    During the meeting Moneme received an "emergency call from downtown," which caused Moneme to abruptly leave the room and postpone the meeting indefinitely.

105.    Later that day, Moneme came to Amos' office and screamed at Amos for "betraying" him by talking to the OIG.

106.    Moneme said that the Mayor's Office had informed him that Amos had breached his trust and that Amos' actions had been inappropriate because this should have remained an internal matter.

107.    Amos' actions in reporting to the OIG were not inappropriate.  Amos acted in accordance with current DDOT SOPs and in accordance with Nickles' direction.

108.    Then, Moneme yelled that Amos should be "sequestered in [his] office" or in the alternative that that Amos "should [be] escorted out of the building."

109.    After making these threats, Moneme demanded Amos' notes and files from the earlier meeting and instructed that Amos would be "precluded from all further investigations," even though investigations were Amos' main responsibility.

110.    Because Moneme precluded Amos from all further investigations, Amos did not become aware of the results of the DDOT investigation into Fort Myer's request for a waiver from its DBE goals.

111.    Just before he left Amos' office, Moneme said to him threateningly, "you're done."


Amos Reports Moneme's Retaliation to Nickles

112.    Amos left the building shortly thereafter to write the end of an e-mail to Nickles detailing Moneme's threats.

113.     In the e-mail to Nickles, Amos stated that the letter was to summarize for the record the communications to date regarding Amos' reporting of suspected criminal misconduct involving members of the D.C. Cabinet, DDOT, Office of Procurement and Contracting, Fort Myer, and its subcontractors, including Peake.

114.     Amos told Nickles that he felt "compelled to communicate that which had been stymied internally and that which [he] believed to be an on-going criminal enterprise affecting the District of Columbia."

115.     Amos made these disclosures outside of his normal chain of command and exclusive of his official duties as Chief of Staff for DDOT.

116.     After Amos sent the e-mail to Nickles, Amos received notification that a 3:00 p.m. meeting with Moneme was cancelled.

117.     Previously, Amos had heard a rumor that Moneme was going to terminate him at the 3:00 p.m. meeting.

118.     Later that same day, Amos was notified by Walker-Mincey that Moneme had contacted her regarding Amos' meeting with the OIG.

119.     Walker-Mincey reported that Moneme demanded a copy of the document that gives the authority to Amos or anyone else to go to the OIG without the Director's approval. Walker-Mincey reportedly gave the director a copy of the SOP that gives this authority.  The section was highlighted and later provided to Amos.

120.     Upon information and belief, when Moneme read the SOP, he responded to Walker-Mincey, "we'll fix that."

<u>Moneme Strips Amos of his Duties</u>

121.     On January 8, 2008, Amos met with Moneme for his routine morning meeting. Kissal was also present.

122.     Without warning, Moneme announced that he was removing responsibility for "Position Authority" (control of employees) from Amos and giving it to Kissal, who oversaw the Office of Resource Management.

123.     Moneme's reason was that Amos' office had "poor controls."

124.     In another meeting later that morning with all the Associate Directors present, Moneme announced publicly that he was taking away responsibility for Position Authority from Amos and giving it to Kissal because Amos had no personnel authority or expertise in this area and Moneme was unhappy with Amos' hiring strategy.

125.     Moneme gave two examples to support his decision, which were both incorrect.

126.     However, Moneme's current position contradicted his statement in the last Office of the Director Meeting in late December of 2007 (in which Amos' subordinates were present) when Moneme recognized that Amos' hiring campaign was one of the great achievements of the past year.


<u>Amos Makes More Detailed Disclosures to the FBI and Gives Notice of Protected Action</u>

127.     On or about January 9, 2008, Amos met with the FBI to further discuss his previous disclosures.

128.     On the same day, Amos' attorney sent a letter to Nickles, with a copy to Moneme, explaining that Amos was a whistleblower and that Amos had engaged in protected activity and there should be no further retaliation against him.

129.    On or about January 10, 2008, Amos' attorney sent the letter by fax to Moneme's private fax number.

130.    Amos made all of these disclosures outside of his normal chain of command and exclusive of his official duties as Chief of Staff for DDOT.

<u>Moneme Continues to Retaliate and Strip Amos' Duties</u>

131.    The following day, on or about the morning of January 11, 2008, Amos met with Moneme and one of Amos' subordinates, Penney, an Associate Director appointed by Tangerlini.

132.    Amos asked Moneme why he had consulted Penney, rather than Amos regarding incidents involving Lasharn Hamilton ("Hamilton") and Michael Scott ("Scott").

133.    Moneme became very angry with Amos and stated:  "I am the Director and the Associate Directors report to me and not to you and hence they are only accountable to me."

134.    Amos responded to Moneme that he disagreed with him because the Associate Directors also report to Amos and are his subordinates.

135.    Amos showed Moneme a copy of Amos' Position Description, which verified that both Scott and Hamilton were Amos' direct subordinates.

136.    Moneme angrily replied:  "I was a Chief of Staff and I know exactly what your role is . . . you will defer to the Associate Directors and so will your subordinates (the Operations Managers)."

137.    Moneme then stated that Scott and Hamilton were "not to do anything without Kathleen [Penney]'s permission."

138.    Amos reminded Moneme again that Scott and Hamilton did not report to Penney, rather they reported to Amos.

139.    Amos also stated that he is not subordinate to Penney, and cannot effectively serve as Chief of Staff if both he and his staff are subordinate to Penney.

140.    Moneme "blew up" and yelled, "Am I not still the Director?"  Then he immediately stood up and left the room.

<u>Moneme Terminates Amos</u>

141.    At approximately 2:00 p.m. on the same day, Amos was having a closed-door meeting in his office with Hamilton to discuss Scott's EEO complaint against Penney, the subject of the earlier meeting with the Director.

142.    Amos heard a forceful knock at the door, startling both him and Hamilton.  Rarely would anyone knock when Amos' door was closed due to the nature of his job (i.e., he conducted interviews and investigations related to civil rights complaints in his office).

143.    As Amos walked to the door to open it, Moneme opened the door himself and stood in the doorway with a manila folder in his hand.  Amos stated, "Can I help you, Sir?"

144.    Moneme looked into the office and saw Hamilton.  Hamilton appeared very uncomfortable and stood up to leave the office.  Moneme said that he wanted to talk to Amos.

145.    Amos asked if he would like to meet immediately and Moneme said that he would wait outside, suggesting to Amos that the meeting with Hamilton was over.

146.    As Hamilton left the office, Moneme turned toward Amos with a look of hostility and entered his office.   Amos closed the door because he was afraid this would be a loud scene.

In the past, Moneme only came to see Amos if he was angry because their offices were on different floors.  Amos asked Moneme to be seated and then sat down across from him.

147.    Moneme quickly opened the manila folder and stated, "I have something to give you . . . you can read and sign it if you wish . . . or you can just keep a copy."  He handed Amos a letter of termination, which provided that Amos' termination was effective on January 28, 2008, and Amos would be on administrative leave until that time.

148.    Moneme said that Amos must leave the office immediately.  Moneme paused and then, as he was standing to leave Amos' office said, "thank you for your service."

149.    Moneme never made eye contact with Amos, nor did he shake hands.

150.    Right away, Amos sent an e-mail to his attorney, shut down his computer, picked up his personal belongings, and left the office.

151.    On his way out, Amos saw his Executive Assistant, Belynda Roebuck ("Roebuck"), and asked her to come into his office.  Amos told her that he had to leave and when she looked puzzled, he told her that he had been let go.  Roebuck started crying and after reassuring her that "it would be okay," Amos immediately left the office.


### Amos Continues Reporting to the OIG and to the General Counsel to the Mayor

152.    Even after Moneme gave Amos notice of Amos' termination and put Amos on administrative leave, Amos continued to disclose Fort Myer's unethical and fraudulent practices.

153.    On January 22, 2008, Amos and his attorney met with the FBI and the OIG to further discuss all the events that had occurred during Amos' tenure at DDOT, including Fort Myer's unethical practices, the inappropriate and possibly criminal relationship between DDOT officials and Fort Myer, and Moneme's and Nickles' retaliation against Amos.

154.    The following day, on January 23, 2008, Amos and his attorney met with Andrew T. "Chip" Richardson, III, ("Richardson") the Interim General Counsel to the Mayor for the District of Columbia, to disclose the events outlined above.

155.    Amos also reported to Richardson Amos' cooperation with the FBI in its investigation of the events outlined above.  This disclosure to the OIG and then the disclosure to Richardson put D.C., Nickles and Moneme all on notice that Amos had made protected disclosures to the FBI.

156.    These disclosures occurred outside of Amos' chain of command and exclusive of his performance of his official duties.  In fact, Amos was on an administrative absence at the time of these disclosures.

157.    By complaining to Laden, Kissal, Moneme, Nickles, Richardson, the OIG and the FBI that since being released from its debarment, Fort Myer knowingly and fraudulently qualified for FHWA funds by entering into a subcontract with Peake and using Peake as the certified DBE, Amos was making a series of protected disclosures.

158.    Amos also reported that Peake is likely a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified by Edwards as a DBE contractor.

159.    Moreover, according to Gonzalez's site visits to the Foxhall Road and South Capitol Projects, neither Fort Myer nor the designated subcontractors were actually performing the work.

160.    After Amos made his protected disclosures in December 2007, Moneme retaliated against him because of his protected disclosures.

161.    Moneme immediately diminished Amos' responsibilities, took away Amos' files and threatened to sequester Amos in his office or to have him escorted from the building.  Then, approximately one month after his disclosures and despite being warned in a letter from counsel that Amos was a protected whistleblower, Moneme placed Amos on administrative leave.  And then after even more protected disclosures to the FBI, the OIG and the Mayor's Chief Counsel, D.C. and Moneme carried out the termination of Amos' employment.

### Count I
### First Amendment
### Freedom of Speech
### (As Against all Defendants)

162.    Amos incorporates and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

163.    Defendants, and each of them, retaliated against Amos and eventually terminated him because Amos reported to the DDOT Director's Office, to the Executive Office of the Mayor, to the OIG and to the FBI that, *inter alia*, since being released from its debarment, Fort Myer knowingly and fraudulently qualified for FHWA funds by entering into a subcontract with Peake and using Peake as the certified DBE, that Peake is likely a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified by Edwards as a DBE contractor, and that neither Fort Myer nor the designated subcontractors were actually performing the work.

164.    By reporting to the OIG, the FBI, and the D.C. General Counsel, Amos was reporting outside of his normal chain of command and his disclosures went beyond his official duties.

165.    By reporting Fort Myer's fraudulent activities and its inappropriate relationship with DDOT officials, Amos was speaking on a matter of public concern, namely uncovering fraudulent and criminal activity by D.C. government officials and contractors to the D.C. government.

166.    Amos' disclosures did not adversely affect the Defendants' efficiency interest nor did it cause a substantial disruption in the workplace.

167.    Because Amos was speaking outside of his official duties on a matter of public concern that did not adversely affect the efficiency interest of the Defendants, his speech was protected.

168.    Amos' protected speech was a substantial or motivating factor in the Defendants' termination of Amos' employment and their participation in actions which naturally and proximately caused the termination of his employment with DDOT.

169.    Defendants would not have terminated Amos but for his protected speech.

170.    Defendants' termination of Amos' employment and participation in actions which naturally and proximately caused the termination of Amos' employment with DDOT deprived Amos of his right to freedom of speech.

171.    Defendants, and each of them, violated the First Amendment to the Constitution by terminating Amos' employment and participating in actions which naturally and proximately caused the termination of Amos' employment with DDOT because of Amos' protected disclosures and thereby deprived Amos of his right to freedom of speech.

172.    Defendants Moneme and Nickles knowingly violated clearly established rights under the First Amendment to the Constitution in terminating Amos' employment and

25

participating in actions which naturally and proximately caused the termination of Amos'

employment with DDOT and thereby deprived Amos of his right to freedom of speech.

173.    Defendants' actions in unlawfully terminating Amos' employment and

participating in actions which naturally and proximately caused the termination of Amos'

employment with DDOT as alleged in the above paragraphs caused Amos to suffer pecuniary

losses, injuries, and damages, including, but not limited to, lost backpay, lost frontpay, and other

commensurate benefits.

174.    Defendants' actions in unlawfully terminating Amos' employment and

participating in actions which naturally and proximately caused the termination of Amos'

employment with DDOT as alleged in the above paragraphs caused Amos to suffer non-

pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental

anguish, loss of professional reputation, and loss of enjoyment of life.

175.    Defendants' actions in unlawfully terminating Amos' employment and

participating in actions which naturally and proximately caused the termination of Amos'

employment with DDOT as alleged in the above paragraphs were egregious and taken in

conscious disregard of or with deliberate indifference to Amos' rights under the First

Amendment to the Constitution, and were taken outrageously, wantonly, and oppressively with

legal and actual malice.

**Count II**
**First Amendment**
**Freedom of Speech**
**42 U.S.C. § 1983**
**(As Against all Defendants)**

176.    Amos incorporates and realleges the allegations contained in the foregoing

paragraphs as though fully set forth herein.

177.    Defendants, and each of them, retaliated against Amos and eventually terminated him because Amos reported to the DDOT Director's Office, to the Executive Office of the Mayor, to the OIG and to the FBI *inter alia*: that since being released from its debarment, Fort Myer knowingly and fraudulently qualified for FHWA funds by entering into a subcontract with Peake and using Peake as the certified DBE, that Peake is likely a shell company with no vehicles, equipment, business office, or viable assets and was improperly qualified by Edwards as a DBE contractor, and that neither Fort Myer nor the designated subcontractors were actually performing the work.

178.    Defendants' termination of Amos' employment and participation in actions which naturally and proximately caused the termination of Amos' employment with DDOT because of his protected disclosures deprived Amos of his right to freedom of speech.

179.    Defendants, and each of them, violated the First Amendment to the Constitution and violated clearly established rights under the First Amendment to the Constitution of which a reasonable person would have known in terminating Amos' employment and participating in actions which naturally and proximately caused the termination of Amos' employment with DDOT and thereby deprived Amos of his right to freedom of speech.

180.    Defendants, and each of them, acted under color of the law of the District of Columbia in terminating Amos' employment and participating in actions which naturally and proximately caused the termination of Amos' employment with DDOT and thereby deprived Amos of his right to freedom of speech.

181.    Defendants' actions were carried out by Defendant Moneme, an official with final decision-making authority to investigate and terminate the Chief of Staff without due process of law in furtherance of the policy and custom of Defendant D.C.

182.     Defendants, and each of them, violated 42 U.S.C. § 1983 in terminating Amos' employment and participating in actions which naturally and proximately caused the termination of Amos' employment with DDOT by subjecting or causing Amos to be subjected to the deprivation of his rights and privileges secured under the First Amendment to the Constitution under color of the law of the District of Columbia.

183.     Defendants' actions in terminating Amos' employment and participating in actions which naturally and proximately caused the termination of Amos' employment with DDOT as alleged in the above paragraphs caused Amos to suffer pecuniary losses, injuries, and damages, including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

184.     Defendants' actions in terminating Amos' employment and participating in actions which naturally and proximately caused the termination of Amos' employment with DDOT as alleged in the above paragraphs caused Amos to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment, humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

185.     Defendants' actions in terminating Amos' employment and participating in actions which naturally and proximately caused the termination of Amos' employment with DDOT as alleged in the above paragraphs were egregious and taken in conscious disregard of or with deliberate indifference to Amos' rights under the First Amendment to the Constitution and 42 U.S.C. § 1983, and they were taken outrageously, wantonly, and oppressively with legal and actual malice.

**<u>Count III</u>**
**D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*
(As Against the District of Columbia)**

186.    Amos incorporates and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

187.    Amos' December 5, 2007 report to Laden and Kissal, his December 5, 2007 report to Moneme, his December 6, 2007 report to Nickles, his attorney's December 9, 2007 letter to Nickles and Moneme, his December 11, 2007 report to Nickles, his December 11, 2007 report to the OIG, his December 11, 2007 report to the FBI, his December 12, 2007 email to Nickles, his January 22, 2008 report to the OIG and his January 23, 2008 report to the D.C. General Counsel's office, all describing the problems with the Foxhall Road, NW Safety Improvements Project and the South Capitol Street, Near Term Improvement Project and the improper relationship between Fort Myer and Peake and Pessoa and DDOT officials as alleged above, *inter alia*, constituted protected disclosures under the D.C. Whistleblower Protection Act, D.C. Code § 1-615.52(a)(6).

188.    Defendant D.C. was aware that Amos had made protected disclosures to the FBI, outside of Amos' chain of command and exclusive to Amos' duties as Chief of Staff of DDOT.

189.    Defendant D.C.'s actions, *inter alia*, of attempting to coerce Amos into ignoring the improprieties in the relationship between DDOT officials and Fort Myer, telling Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on administrative leave, and terminating Amos' employment with DDOT constituted prohibited personnel actions under the D.C. Whistleblower Protection Act, D.C. Code § 1-615.52(a)(5).

190.    Defendant D.C. violated the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*, in attempting to coerce Amos into ignoring the improprieties in the relationship

between DDOT officials and Fort Myer, telling Amos to keep the matter internal, stripping

Amos of his job responsibilities, placing Amos on administrative leave, and terminating Amos'

employment with DDOT.

191.    Defendant D.C.'s actions in attempting to coerce Amos into ignoring the

improprieties in the relationship between DDOT officials and Fort Myer Construction, telling

Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on

administrative leave, and terminating Amos' employment with DDOT as alleged in the above

paragraphs caused or threatened to cause Amos to suffer pecuniary losses, injuries, and damages

including, but not limited to, lost backpay, lost frontpay, and other commensurate benefits.

192.    Defendant D.C.'s actions in attempting to coerce Amos into ignoring the

improprieties in the relationship between DDOT officials and Fort Myer, telling Amos to keep

the matter internal, stripping Amos of his job responsibilities, placing Amos on administrative

leave, and terminating Amos' employment with DDOT as alleged in the above paragraphs

caused Amos to suffer non-pecuniary injuries taking the form of emotional pain, embarrassment,

humiliation, mental anguish, loss of professional reputation, and loss of enjoyment of life.

193.    Defendant D.C.'s actions in attempting to coerce Amos into ignoring the

improprieties in the relationship between DDOT officials and Fort Myer, telling Amos to keep

the matter internal, stripping Amos of his job responsibilities, placing Amos on administrative

leave, and terminating Amos' employment with DDOT as alleged in the above paragraphs were

egregious and taken in conscious disregard of or with deliberate indifference to Amos' rights

under the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*, and were taken

outrageously, wantonly, and oppressively with legal and actual malice.

## Prayer for Relief

Wherefore, Plaintiff Stephen Amos respectfully requests that the Court enter judgment in his favor and award him the following relief:

A.    an Order declaring that Defendants violated Amos' rights under the First Amendment to the Constitution, 42 U.S.C. § 1983, and the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51, *et seq.*, in attempting to coerce Amos into ignoring the improprieties in the relationship between DDOT officials and Fort Myer Construction, telling Amos to keep the matter internal, stripping Amos of his job responsibilities, placing Amos on administrative leave, and terminating Amos' employment with DDOT; and that Defendants wrongfully terminated Amos in violation of public policy, which restrains and enjoins Defendants from further violating Amos' rights and wrongfully terminating his employment with DDOT;

B.    an Order reinstating Amos in the employ of DDOT retroactive to January 28, 2008;

C.    record correction and expunction;

D.    compensatory damages in an amount to be determined at trial, in excess of $75,000 from all Defendants jointly and severally, to compensate Amos for pecuniary losses, injuries, and damages proximately caused by Defendants' unlawful conduct;

E.    punitive damages in an amount to be determined at trial no less than ten times the amount of compensatory damages from all Defendants jointly and severally;

F.    the attorneys' fees and costs incurred by Amos in the prosecution of this action from all Defendants jointly and severally;

G.    and such other relief as may be just and appropriate.

## <u>Demand for Jury Trial</u>

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

Respectfully Submitted,


/s/ Adam Augustine Carter
Adam Augustine Carter, Esq.
R. Scott Oswald, Esq.
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
acarter@employmentlawgroup.net
soswald@employmentlawgroup.net
*Counsel for Plaintiff Stephen Amos*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of June, 2008, a true and correct copy of the

foregoing Plaintiff's First Amended Complaint for Equitable and Monetary Relief and Demand

for Jury Trial has been served upon the following via ECF:


Leah Brownlee Taylor, Esq.
Assistant Attorney General
Office of the Attorney General for the District of Columbia
441 4th Street N.W., 6th Floor South
Washington, D.C.  20001
leah.taylor@dc.gov

*Counsel for Defendants District of Columbia,*
*Emeka C. Moneme and Peter J. Nickles*


/s/ Adam Augustine Carter
Adam Augustine Carter