**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

| | |
|---|---|
| **STEPHEN P. AMOS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE DISTRICT OF COLUMBIA,** | ) |
| | )    **Civil Action No. 08-00554 (RMC)** |
| **and** | ) |
| | ) |
| **EMEKA C. MONEME,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **PETER J. NICKLES, ESQ.,** | ) |
| | ) |
| **Defendants.** | ) |

———————————————————————

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff Stephen Amos ("Amos"), by and through undersigned counsel, hereby files this Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Motion to Dismiss").

At a minimum, Amos has alleged sufficient facts in his Complaint to survive Defendants' Motion to Dismiss. Accordingly, this Court should deny Defendants' motion at bar.

**Factual Background**

In his First Amended Complaint ("FAC"), Amos details the factual background of this dispute and paragraphs 14 to 161 thereof are incorporated here by this reference. For the Court's convenience, a summary of the relevant allegations is included below:

In July of 2007, District of Columbia Department of Transportation ("DDOT") Director Emeka C. Moneme ("Moneme") hired Amos to the position of Chief of Staff in the Management Supervisory Service. *See* FAC ¶ 14; Motion to Dismiss at 5. Amos supervised the Offices of Integrity and Compliance, Risk Management/Emergency Preparedness, Communications, and Administrative and Management Support Services and assisted DDOT employees and management in achieving "the highest level of integrity in order that the agency's external customers receive reliable and efficient service." *See* FAC ¶ 15; Motion to Dismiss at 5. When Amos arrived at DDOT, he found the office in clear need of his expertise in assessing and resolving problems within the agency. *See* FAC ¶ 17.

During his tenure as Chief of Staff at DDOT, a safety incident occurred involving Fort Myer Construction Corporation ("Fort Myer"), one of DDOT's contractors. *See id.* ¶ 18; Motion to Dismiss at 5. As Amos investigated the incident, he learned that years earlier, Fort Myer was convicted of bribing a number of DDOT employees in a bid-steering and bid-rigging investigation conducted by the FBI, and had been debarred as a recipient of federally funded construction contracts for a period of eighteen months. *See* FAC ¶ 19. About a month after the safety incident, Amos became aware that DDOT had failed to meet its 2007 Disadvantaged Business Enterprise ("DBE") goals. *See id.* ¶¶ 20-21; Motion to Dismiss at 5. Amos signed a letter to the United States Department of Transportation explaining that the DDOT had missed its DBE goal and would be reducing its goal. *See* FAC ¶¶ 21-23, 25; Motion to Dismiss at 5.

On or about December 3, 2007, Amos' employee Francisco Edwin Gonzalez ("Gonzalez") revealed to Amos that Gonzalez was concerned about improprieties in the relationship between DDOT officials, Fort Myer, Peake Construction Company ("Peake") and Pessoa Construction Company ("Pessoa"). *See* FAC ¶ 28. Gonzalez articulated to Amos that

because of its debarment up until the previous year, Fort Myer had been prohibited from access to federal funds or work on projects that included federal funds. *See id.* ¶ 31. Gonzalez believed that since the end of its debarment, Fort Myer had been working closely with DDOT officials to fraudulently obtain USDOT funding for its contracts. *See id.* ¶ 32. As Fort Myer is not a qualified DBE, it formed relationships with subcontractors, such as Peake, who were qualified as DBEs. *See id.* ¶ 38. Moreover, in conducting a site visit to the Foxhall Road, NW Safety Improvements Road Project on August 27, 2007, Gonzalez had discovered that Peake was not actually performing the work at the site, but the work was being performed by a third party, DEN United – an entity DDOT had not authorized to be present on the work site. *See id.* ¶ 40; Motion to Dismiss at 6. Thus, Fort Myer was not in compliance with the 49 C.F.R. Part 26 requirements. *See* FAC ¶ 41. Gonzalez told Amos that he believed Peake is a shell company because it has no assets, no equipment, no trucks, and no office, and its CEO is Parney Jenkins, Sr. ("Jenkins"). *See id.* ¶ 42. Jenkins is a former DDOT official who was convicted of taking bribes from Fort Myer. *See id.* ¶ 43. The following day, Gonzalez submitted a formal memo to Amos describing these problems. *See id.* ¶ 46.

In his memo, Gonzalez further stated that a letter of noncompliance had been sent to Fort Myer in September of 2007. *See id.* ¶ 50; Motion to Dismiss at 6. Fort Myer responded that it was committed to its DBE goal as set forth in its DBE Plan and assured DDOT that it would meet its goals but then later requested a waiver because it was unable to meet its DBE goals. *See* FAC ¶ 50; Motion to Dismiss at 6. Fort Myer did not request that its DBE goals be waived until after Fort Myer had already failed to meet the DBE goals. *See* FAC ¶ 51; Motion to Dismiss at 6. After Gonzalez's report, DDOT began an investigation into this issue regarding Fort Myer's request for a DBE waiver, but DDOT's investigation was not complete until sometime in late

December 2007, or early January 2008, and by that time Amos was excluded from participation in all investigations. *See* FAC ¶ 52.

On or about December 5, 2007, Amos told DDOT Deputy Directors Ken Laden ("Laden") and Carol Kissal ("Kissal"), both jointly and separately, about the foregoing facts he learned from Gonzalez. *See id.* ¶ 53; Motion to Dismiss at 6. Amos told Kissal that he planned to share this information with the OIG. *See* FAC ¶ 54. Kissal became upset and stated that Dan Tangerlini ("Tangerlini"), the D.C. City Administrator, had advised her to manage these risk-related issues internally and said that it was best that the information not go outside of the Director's Office. *See id.* ¶ 55.

Later that same day, Moneme came to Amos' office "to talk," and Amos told Moneme about the information in Gonzalez's now-formal report. *See id.* ¶ 57; Motion to Dismiss at 6. Amos further communicated to Moneme that Amos wanted to disclose the information to the OIG even though Kissal had said earlier that Amos should keep it "internal" which was her direction from Tangerlini. *See* FAC ¶ 58. Moneme became angry and ordered Amos to keep the information internal and "quiet" and not share it with the OIG. *See id.* ¶ 59; Motion to Dismiss at 6. Moneme's order contradicted Amos' duty to report the violation. DDOT's Standard Operating Policy ("SOP") regarding complaints specified that, "[i]f the matter is of such a sensitive and/or if the matter personally involves and/or implicates the Director, . . . directly or indirectly, the Chief may forward the matter directly to the Inspector General without consultation by the Director . . ." *See* FAC ¶ 60. The SOP continued, "[i]f the Agency fails to act and the matter is of such an egregious manner that failing to act places the Agency and/or its ability to competently carry out its operations/mission, the Chief shall notify the appropriate

District of Columbia officials in order to ensure that proper and immediate action is taken." *See id.*

On or about December 6, 2007, because Moneme was unresponsive to Amos' concerns, Amos called Nickles, General Counsel for the District of Columbia, to request a private meeting to share the foregoing information. *See id.* ¶ 62. At their meeting, Amos shared with Nickles an overview of the suspected misconduct and related to Nickles the information Gonzalez had told Amos. *See id.* ¶ 65. Amos believed these allegations of criminal fraud among DDOT officials and DDOT contractors were "of such an egregious manner that failing to act" would compromise DDOT and "its ability to competently carry out its operations/mission." *See id.* ¶ 67. This misconduct that Amos reported included: allegations of large and numerous financial contributions by Fort Myer's owners, family members, and employees to Mayor Fenty's campaign; DDOT officials' interventions to conceal and/or facilitate the ongoing practices of Tangerlini; bid-rigging and the steering of federally funded contracts to Fort Myer through Peake; and Edwards' likely involvement in criminal misconduct. *See id.* ¶ 68; Motion to Dismiss at 6-7. After Amos relayed his concerns, Nickles said that Amos should report the information to the Office of the Inspector General ("OIG"). *See* FAC ¶ 69; Motion to Dismiss at 7.

On or about December 7, 2007, Amos and his subordinate, Danette Walker-Mincey ("Walker-Mincey"), met with Leonard Odom ("Odom"), Assistant Inspector General. *See* FAC ¶ 71; Motion to Dismiss at 7. Amos was prepared to give a full briefing about his concerns and brought the corresponding investigative reports previously mentioned, but he and Walker-Mincey were extremely worried about the confidentiality of the information and whether they (or their subordinates) would suffer retaliation. *See* FAC ¶ 72. In order to assuage Walker-

Mincey's fears, before disclosing many details, Amos asked Odom about what protection the OIG could guarantee for Amos, Walker-Mincey, and any subordinates that would be coming forward. *See id.* ¶ 73. Odom told Amos that without knowing more details, he could not guarantee that the information would remain confidential or that Amos would not be retaliated against. *See id.* ¶ 74. After some time, the Chief of Staff and General Counsel for the Inspector General came in and reiterated that they would not provide any protections against retaliation, but that they would communicate Amos' and Walker-Mincey's concerns to Nickles, and would leave the matter in Nickles' hands. *See id.* ¶ 78.

On or about December 11, 2007, Amos contacted the OIG and Nickles' office to follow-up on Amos' request for a letter protecting Amos and more importantly, Amos' subordinates, from retaliation for their disclosures. *See id.* ¶¶ 81, 83. As he had at the earlier meeting, Amos again requested that Nickles write a letter of assurance that Amos and his subordinates would not be retaliated against before they would disclose further information. *See id.* ¶ 84. Nickles changed his attitude of helpfulness and replied that he did not have the authority to make assurances without knowing more about the situation. *See id.* ¶ 85. However, as General Counsel to the Mayor, and as a practicing attorney Nickles was aware of the D.C. Whistleblower Protection Act that affords protection from retaliation to certain employees of the city government who blow the whistle regarding legal violations. *See id.* ¶ 86. At Nickles' direction, Amos emailed to Nickles a number of documents, including some related to a very recent example of a simple internal misconduct investigation. *See id.* ¶ 87. Nickles chastised Amos for his failure to disclose fully the matter at hand to the OIG on December 7, 2007. *See id.* ¶ 91. Amos again asked Nickles for a letter assuring that Amos and Amos' subordinates would not be retaliated against, but Nickles refused to provide one. *See id.* ¶ 92. Amos explained that he and

his subordinates were concerned that they would be victims of DDOT's culture and storied history of reprisals against employees who blew the whistle on improper or even criminal conduct. *See id.* Nickles did not wish to discuss any sort of assurances and emphatically stated: "I do not make such commitments on a whim for employees that are in jeopardy and no letter of assurance will be forthcoming." *See id.* ¶ 93; Motion to Dismiss at 7. Amos left the meeting, immediately contacted the Washington Field Office of the FBI and made a complete disclosure of the events to date. *See* FAC ¶¶ 97-98; Motion to Dismiss at 8.

On or about the morning of December 12, 2007, Moneme began retaliating against Amos. *See* FAC ¶ 103. Moneme came to Amos' office and screamed at Amos for "betraying" him by talking to the OIG. *See id.* ¶ 105. Moneme said that the Mayor's Office had informed him that Amos had breached his trust and that Amos' actions had been inappropriate because this should have remained an internal matter. *See id.* ¶ 106. Amos' actions in reporting to the OIG were not inappropriate, as Amos had acted in accordance with current DDOT SOPs and at Nickles' direction. *See id.* ¶ 107. Moneme yelled that Amos should be "sequestered in [his] office" or in the alternative that that Amos "should [be] escorted out of the building." *See id.* ¶ 108; Motion to Dismiss at 8. After making these threats, Moneme demanded Amos' notes and files from the earlier meeting and instructed that Amos would be "precluded from all further investigations," even though investigations were Amos' main responsibility. *See* FAC ¶ 109; Motion to Dismiss at 9. Just before he left Amos' office, Moneme said to him threateningly, "you're done." *See* FAC ¶ 111. Amos shortly thereafter to wrote an e-mail to Nickles detailing Moneme's threats and all of the foregoing events to date. *See id.* ¶¶ 112-114.

On January 8, 2008, Amos met with Moneme for his routine morning meeting, Moneme announced that he was removing responsibility for "Position Authority" (control of employees)

from Amos and giving it to Kissal, who oversaw the Office of Resource Management. *See id.* ¶¶ 121-22. Moneme's reason was that Amos' office had "poor controls." *See id.* ¶ 123. On or about January 9, 2008, Amos met with the FBI to further discuss his previous disclosures. *See id.* ¶ 127. Later that same day, Amos' attorney sent a letter to Nickles, with a copy to Moneme, explaining that Amos was a whistleblower and that Amos had engaged in protected activity and there should be no further retaliation against him. *See id.* ¶ 128; Motion to Dismiss at 9. The next day, Amos' attorney sent the letter by fax to Moneme's private fax number. *See* FAC ¶ 129; Motion to Dismiss at 9. Even after this notice of retaliation, Moneme continued to strip Amos' duties by removing Amos' authority to supervise DDOT staff. *See* FAC ¶¶ 131-40. Then, on January 11, 2008, Moneme handed Amos a letter of termination, which provided that Amos' termination was effective on January 28, 2008, and Amos would be on administrative leave until that time. *See id.* ¶ 147; Motion to Dismiss at 9. Moneme said that Amos must leave the office immediately. *See* FAC ¶ 148.

Even after notice of his termination, Amos continued to make protected disclosures to the OIG and FBI. On January 22, 2008, Amos and his attorney met with the FBI and the OIG to further discuss all the events that had occurred during Amos' tenure at DDOT, including Fort Myer's unethical practices, the inappropriate and possibly criminal relationship between DDOT officials and Fort Myer, and Moneme's and Nickles' retaliation against Amos. *See id.* ¶ 153; Motion to Dismiss at 9. The following day, on January 23, 2008, Amos and his attorney met with Andrew T. "Chip" Richardson, III, ("Richardson") the Interim General Counsel to the Mayor for the District of Columbia, to disclose the events outlined above. *See* FAC ¶ 154; Motion to Dismiss at 9. Amos also reported to Richardson Amos' cooperation with the FBI in its investigation of the events outlined above. This disclosure to the OIG and then the disclosure

to Richardson put D.C., Nickles and Moneme all on notice that Amos had made protected disclosures to the FBI. *See id.* ¶ 155.  Amos was on an administrative absence at the time of these disclosures, so they were completely separate from his regular duties ad DDOT Chief of Staff. *See id.* ¶ 156.

As a result of Amos' protected disclosures, Moneme immediately diminished Amos' responsibilities, took away Amos' files and threatened to sequester Amos in his office or to have him escorted from the building.  Then, approximately one month after his disclosures and despite being warned in a letter from counsel that Amos was a protected whistleblower, Moneme placed Amos on administrative leave.  Throughout this time, Nickles failed to provide Amos' with his legal right to have protection from potential DDOT retaliation against Amos' disclosures.  And then after even more protected disclosures to the FBI, the OIG and the Mayor's Chief Counsel, D.C. and Moneme carried out the termination of Amos' employment.

### <u>Standard of Review</u>

A pleading should not be dismissed for failure to state a claim unless it fails to "'plead enough facts to state a claim to relief that is plausible on its face.'"  *See Rattigan v. Gonzales*, 2007 WL 1577855 at * 6 (D.D.C. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)).  When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must presume that the allegations in the complaint are true and draw "all reasonable factual inferences" in favor of the plaintiff.  *See Rattigan*, at * 6.  Thus, in determining whether Amos' complaint against the Defendants may be dismissed, the Court must evaluate whether Amos has "raised a right to relief above the speculative level," assuming the facts which he alleges, and all logically flowing inferences, are true and in his favor.  *See id.*  In

assuming that the facts of Amos' First Amended Complaint are true, it must be clear that there is a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim." *Twombly*, 127 S. Ct. at 1969 n. 8 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).  Here, the allegations in Amos' First Amended Complaint all detail emails and clear documentary evidence that raise his allegations well above the necessary threshold.

### Argument

I.    **Amos Has Alleged Facts Sufficient to State a First Amendment Claim and Accordingly, Defendants' Motion to Dismiss Should be Denied.**

    A.    Amos Made His Protected Disclosures as a Private Citizen.

Amos went outside his chain of command in reporting to the OIG and the FBI, thus these disclosures were made as a public citizen, outside the ambit of Amos' official duties.  Amos concedes that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Waters v. Churchill*, 511 U.S. 661 (1994)).  Nevertheless, "public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417.

Defendants rely primarily on *Garcetti* for the proposition that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ." *Garcetti*, 547 U.S. at 420-22.  Defendants argue that in the instant case, Amos' speech was related to his responsibilities as Chief of Staff, and therefore Amos did not speak as a private citizen.  *See* Motion to Dismiss at 15.  Defendants plod through a long list of Amos' official responsibilities, and conclude that because Amos' disclosures related to these responsibilities, all of Amos' disclosures were made pursuant to Amos' official

duties.  *See id.* at 15-16.  Defendants' make a particular point of attacking Amos' statement that his disclosures were "made outside of Amos' normal chain of command," asserting that Amos has missed the point and that the relevant inquiry is whether Amos' disclosures were made pursuant to his official duties.  *See id.* at 16.  This argument demonstrates that the Defendants have missed the subtle difference between:  1) speech in the normal chain of command, and 2) speech pursuant to official duties.

Defendants proceed through a long discussion of *Garcetti* and its progeny as support for the argument that speech made within the scope of an employee's official responsibilities does not merit First Amendment protection.  *See id.* at 12-14.  However, the Defendants appear to be very selective in reading each of these cases, finding only that the ultimate holdings support their position, and taking no notice of any differences noted by the Court.  In fact, the Court has recognized important factual distinctions that more clearly define when an employee is speaking within the scope of his employment, and when he is reporting as a private citizen.  For example, the Defendants ignore a critical distinction the Court recognized in *Garcetti*.  In *Garcetti*, the plaintiff, Ceballos, was a state deputy attorney who was denied a promotion after writing a memo to his supervisors regarding inaccuracies in an affidavit used to procure a search warrant. *See Garcetti*, 547 U.S. at 413-15.  The Supreme Court distinguished Ceballos' case from that of the teacher in *Pickering* who wrote a letter to a local newspaper addressing issues including the funding policies of his school board, noting the latter was "the kind of activity engaged in by citizens who do not work for the government."  *Garcetti*, 547 U.S. at 423; *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968).  The Court also recognized that "[a] public employer that wishes to encourage its employees to voice concerns privately retains the option of instituting internal policies and procedures that are receptive to employee criticism.  Giving

employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public." *Garcetti*, 547 U.S. at 424.

Defendants also cite this Court's March 2008 decision in *Williams v. Johnson*[1] to support the argument, but again conveniently seem to have missed the second half of the Court's analysis regarding the Williams' protected disclosures. *See* 537 F. Supp. 2d 141, 152 (D.D.C. 2008). The Defendants rely on this Court's holding that Williams did not speak as a citizen when she testified before the D.C. Counsel because her job duties as Chief of the Department of Health required her to provide findings to senior executive personnel in the D.C. Government. *See id.* at 151-52. However, Defendants ignore the fact that this Court also recognized that Williams sufficiently alleged facts that raise the inference that she did in fact speak as a private citizen when she made private disclosures to a D.C. councilman. *See id.* at 152. Williams alleged that she met privately with the councilman, and that her supervisors became aware of her meeting with the councilman "at some point after the meeting occurred." *Id.* The Court found that these allegations "[raise] a reasonable inference that Plaintiff's supervisors were not aware of, and therefore did not authorize, the meeting." *Id.* The Court found these allegations and inferences sufficient to demonstrate that Williams spoke as a private citizen, and her claim survived the motion to dismiss. *See id.*

Amos' claim is strikingly similar. Amos made several reports and disclosures within DDOT and to Moneme. *See, e.g.,* FAC ¶¶ 53, 57. Each of these disclosures fell on deaf ears, forcing Amos to take his concerns outside of DDOT, to Nickles, to the OIG and eventually to the FBI and to the Mayor's General Counsel. *See, e.g., id.* ¶¶ 69, 71, 85, 97. Even if Amos' disclosures to Moneme are not protected, because Amos was officially bound to report to

---

[1]    Defendants' incorrectly style this case *Williams v. District of Columbia* in the Motion to Dismiss.

Moneme, his disclosures to Nickles, the OIG and the FBI clearly do merit constitutional protection. As in *Williams*, Amos' allegation that he and his attorney fully briefed the Mayor's General Counsel about Amos' disclosures to the FBI raises a reasonable inference that Amos' supervisors were not aware of, and therefore did not authorize, Amos' meeting with the FBI. *See* FAC ¶¶ 154-55; *Williams*, 537 F. Supp. 2d at 152. The fact that Amos' report to the FBI concerned his official duties as Chief of Staff does not defeat his First Amendment claim, because, as "the Supreme Court has warned, official job descriptions are 'neither necessary nor sufficient to demonstrate that conducting [a] task is within the scope of [an] employee's professional duties for First Amendment purposes.'" *Id.* (citing *Garcetti*, 547 U.S. at 424-35). At the time of Amos' initial disclosures to the FBI, OIG and Mayor's General Counsel, Amos was a still acting in his role as DDOT's Chief of Staff. Amos' subsequent disclosures to the FBI, the OIG and the General Counsel to the Mayor were while Amos was on an administrative absence from DDOT, awaiting his final termination. *See* FAC ¶ 156. An employee who reports outside of the ambit of his Agency's supervisory authority while on administrative absence from his job certainly can not be said to be acting and disclosing pursuant to his official duties, even if those disclosures relate to those duties.

Ultimately, Amos will be required to demonstrate, as a matter of law, that he spoke as a citizen when he met privately with the OIG and the FBI to disclose the unlawful activities underway at DDOT. However, for the time being, Amos' First Amended Complaint contains factual allegations and raises reasonable inferences that demonstrate when Amos met with the OIG and FBI he acted as a private citizen, rather than pursuant to his official duties. Because

Amos' speech was made as a public citizen, his speech warrants First Amendment protection, and Defendants' motion to dismiss Amos' claim should be denied.[2]

    B.    <u>Amos' Made Protected Disclosures on a Matter of Public Concern.</u>

Amos' allegations clearly demonstrate that he spoke on a matter of public concern in disclosing DDOT's unlawful activity to Moneme, Nickles, the OIG, the FBI and the Mayor's General Counsel. *See* FAC ¶¶ 68, 153-55. It is clearly established that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Furthermore, "[t]he reporting of waste, fraud, and abuse are matters of public concern." *Sanders v. District of Columbia*, 522 F. Supp. 2d 83, 89 (D.D.C. 2007) (citing *Bridges v. Kelly*, 977 F. Supp. 503, 509 (D.D.C. 1997)).

The Defendants argue that Amos' disclosures did not involve any violation of the law, therefore Amos did not speak on a matter of public concern. *See* Motion to Dismiss at 17-18, 27-33. As discussed in Section III(A) *infra*, Defendants clearly misunderstand the laws relevant to this claim. Amos made allegations that Fort Myer fraudulently qualified as a DBE; Fort Myer's owners, family members, and employees made large and numerous financial contributions to Mayor Fenty's campaign; DDOT officials' intervened to conceal and/or facilitate the ongoing practices of Tangerlini, awarding D.C. contracts to "friendly" contractors; bid-rigging and the steering of federally funded contracts to Fort Myer through Peake; and likely involvement of DDOT officials in criminal misconduct. *See* FAC ¶ 68. Moreover, Amos reported the Defendants' retaliation against him for these disclosures, in violation of the D.C. WPA. *See id.* ¶¶ 153-55. Amos' allegations of fraud and abuse are clearly matters of public

---

[2]    *See Williams*, 537 F. Supp. 2d at 152 (holding that plaintiff's First Amended Complaint alleged sufficient facts to survive Defendants' motion to dismiss).

concern that warrant Constitutional protection.  Accordingly, Defendants' motion to dismiss should be denied.

> C.    D.C.'s Interest Does Not Outweigh Amos' First Amendment Interest.

Under *Garcetti*, Amos has also established the second prong of the four part test with respect to his speech before the FBI – his First Amendment interest in being able to report freely governmental fraud and abuse outweighs D.C.'s interest in disciplining its employees.  *See Garcetti*, 547 U.S. at 418.  While it is true that, "[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission," *Garcetti* does not give an employer free reign to quash any contrarian speech by an employee.  *See Garcetti*, 547 U.S. at 422-423.  In determining whether the government's interest should outweigh the employee's First Amendment interest, a court should consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on the close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (internal citations omitted).

The Defendants argue that Amos did not follow D.C. protocol in reporting Amos' allegations.  D.C. protocol provides that "an employee shall report directly and without undue delay to his or her agency head and to the Office of the Inspector General of the District of Columbia any information concerning conduct which he or she knows, or should reasonably know, involves corrupt or other criminal activity, or conflict of interest."  *See* DCMR 1803.8.  However, DDOT's standard operating procedure continues, "[i]f the Agency fails to act and the matter is of such an egregious manner that failing to act places the Agency and/or its ability to

competently carry out its operations/mission, the Chief shall notify the appropriate District of Columbia officials in order to ensure that proper and immediate action is taken." FAC ¶ 60.

Amos followed each of these procedures. Amos initially reported his concerns to the Deputy Directors of DDOT, Kissal and Laden. *See id.* ¶ 53. Amos then reported to Moneme. *See id.* ¶ 57. In both of these instances, Amos was told to keep the matter quiet and not share the information outside the Director's office or with OIG. *See id.* ¶¶ 55, 59. Because Amos' efforts to disclose DDOT's fraud were stymied, Amos went to Nickles, who instructed Amos to report to the OIG. *See id.* ¶ 69. Amos went to the OIG to report his concerns. *See id.* ¶ 71. At this point, after facing so much internal resistance at DDOT for reporting these issues, Amos attempted to procure an assurance that neither he nor his employees would be retaliated against for making these disclosures, but the OIG would not provide any such assurance. *See id.* ¶¶ 73-74. Amos then went back to Nickles, who instead of helping, chastised and threatened Amos. *See id.* ¶¶ 85, 91, 93. It was only after multiple attempts to resolve the matter internally that Amos took his disclosures to the FBI. *See id.* ¶ 97. These courageous steps can hardly be deemed acts of disloyalty.

Moreover, Amos' disclosures regarded fraud and corruption among DDOT officials. *See id.* ¶¶ 68, 153-55. Amos cannot be branded as disloyal for failing to cooperate and turn a blind eye to the fraudulent and potentially criminal activities of his superiors. The Defendants assert that Moneme promptly acted on Amos' disclosures, holding a meeting the day after receiving Walker-Mincey's report. *See* Motion to Dismiss at 20. However, this meeting was a previously scheduled meeting to discuss DDOT contracts in general, not a meeting specifically scheduled to discuss Amos' allegations regarding Fort Myer's contract. *See* FAC ¶ 103. The meeting was interrupted when Moneme received a telephone call, presumably informing Moneme about

Amos' disclosures. *See id.* ¶ 104. Then, later that day, Moneme came to Amos' office, screamed at Amos, accused Amos of betrayal, threatened to sequester Amos in his office or escort Amos from the building, took Amos' notes and files, stripped Amos of his investigatory responsibilities, and told him, "you're done." *See id.* ¶¶ 105-11. These clearly retaliatory actions are hardly part of "DDOT's investigative process" as alleged by the Defendants. *See* Motion to Dismiss at 20. Amos reported to Moneme, as per DDOT protocol, then when Moneme instructed Amos to depart from normal procedures, Amos disregarded Moneme's direction and continued to follow the established methods of reporting to the proper authorities. This is not a disloyal action.

Amos' disclosures may only be characterized as disrupting the operation of DDOT's regular enterprise if DDOT's enterprise is comprised of fraudulent and potentially criminal bid-rigging and acquisition of federal funds. Amos' primary job function was to investigate and assist DDOT management in achieving the "highest level of integrity in order that the agency's external customers receive reliable and efficient service." *See* FAC ¶ 15. Amos' disclosures did not disrupt this goal, but were aimed at accomplishing this purpose. Had Moneme instituted any kind of investigation into this matter, Amos would have gladly carried out his duties in investigating. However, Moneme did nothing, and by doing nothing Moneme perpetuated a culture within DDOT famous for turning a blind eye to corruption and fraud. This culture of fraud was the only "enterprise" that was greatly undermined and interrupted by Amos' continued disclosures.

It is clear that Amos has sufficiently alleged fraudulent activity that does not evidence any disloyalty, any impediment to Amos' duties, or any interference with DDOT's regular

business enterprise. As such it cannot be said that D.C.'s interest outweighs Amos' First

Amendment interest, so the Defendants' motion to dismiss should be denied.

> D.  Amos' Complaint Does Allege Adverse Action Causally Related to Amos'
>     Disclosures to the FBI.

To establish a violation of the First Amendment, Plaintiff must demonstrate that the

employee's speech was a substantial or motivating factor for the denial of a right or benefit. *See*

*Tao v. Freeh*, 27 F.3d 635, 638-39 (D.C. Cir. 1994). Amos has alleged sufficient facts to

demonstrate plausibly that his protected disclosures to the FBI were substantial or motivating

factors in the Defendants' retaliation against Amos, including their ultimate decision to terminate

him.

Amos' attorney sent letters to Nickles and Moneme, on January 9, 2008 and January 10,

2008, respectively, informing Nickles and Moneme that Amos had made protected disclosures

and, thus, was a whistleblower. *See* FAC ¶¶ 128-29. It is not unreasonable to think that upon

receiving notification that Amos believed himself to be a whistleblower, Moneme and Nickles

would adjust their behavior towards Amos accordingly. However, even after receiving this

notification, Moneme continued to retaliate against Amos, further stripping Amos of his duties

and ultimately terminating him. *See id.* ¶ 161.

The Defendants argue that they did not learn of Amos' disclosure until the FBI until after

they had decided to terminate Amos, and so his termination can not be causally related to his

disclosures to the FBI. *See* Motion to Dismiss at 21. This argument is fatally flawed. Even if it

is true that the Defendants did not learn of Amos' disclosures to the FBI until Amos' January 23,

2008 meeting with Richardson, at that time Amos was still on administrative absence from

DDOT and had not yet been terminated. *See* FAC ¶¶ 154-56. Upon learning that Amos had in

fact made protected disclosures, the Defendants had a perfect opportunity to retract their notice

to Amos of his termination.  The Defendants sat on their hands and did nothing.  Because Amos

had not yet actually been terminated, the Defendants still had an opportunity to forbear from

additional retaliation, but they did not.  This failure to retract the notice of Amos' termination is

yet another act of retaliation against Amos on the part of the Defendants.

The D.C. Circuit has said that "'[e]mployer action taken against an employee in response

to her exercise of free speech need not be as significant as the denial of a promotion to raise a

constitutional claim.'  Further, 'the Supreme Court has noted [that] the First Amendment protects

government employees from 'even an act of retaliation as trivial as failing to hold a birthday

party for a public employee . . . when intended to punish her for exercising her free speech

rights.'"  *Williams*, 537 F. Supp. 2d at 149 (internal citations omitted).  At the very least, the

Defendants failure to retract the notification of Amos' pending termination is such an act of

retaliation.  Amos has alleged sufficient facts to demonstrate that his protected disclosures were

substantial or motivating factors in the Defendants' decision to retaliate against Amos.

Accordingly, Defendants' motion to dismiss should be denied.

E.     D.C.'s Municipal Liability

Pursuant to 42 U.S.C. § 1983, "any person who, under color of any law, statute,

ordinance, regulation, custom, or usage of any State, shall subject or cause to be subjected, any

person to the deprivation of any rights, privileges or immunities secured by the Constitution of

the United states, shall . . . be liable to the party injured . . . ."  *Williams*, 537 F. Supp. 2d at 154.

The District of Columbia is treated as a municipality for purposes of 42 U.S.C. § 1983.  *See*

*Bridges*, 977 F. Supp. at 506 n. 4 (citing *Dorman v. District of Columbia*, 888 F.2d 159, 162

(D.C. Cir. 1989)).  It is further recognized that "a local government may not be sued under §

1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

To qualify as a final decision-maker, an official must have policymaking authority specific to the conduct in question. *See Williams*, 537 F. Supp. 2d at 154 (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) ("We hold that municipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.") (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985))). This Court, in *Banks v. District of Columbia*, concluded that the Director of the D.C. Department of Mental Health was a final policymaker under D.C. law because she was responsible for the " 'general direction and supervision' " of the administration, she "promulgate[d] rules to run [her] department" and exercise[d] "vast responsibilities and expansive authority[,]" including making personnel decisions. *See* 377 F. Supp. 2d 85, 91 (D.D.C. 2005).

Amos has alleged that Moneme was a final policymaker in the District, by virtue of his position as Director of DDOT. *See* FAC ¶ 12. Moreover, it is clear that as the Director of DDOT, Moneme directed and supervised DDOT, exercised vast responsibilities and authority, and made personnel decisions, including the decision to terminate Amos. *See id.* ¶¶ 12, 109, 122, 124, 133, 147. As this Court noted regarding strikingly similar allegations in *Williams*, "[w]hile these allegations are not robust, they are nevertheless sufficient at the pleading stage." *See* 537 F. Supp. 2d at 154. Amos' clear allegations that Moneme had final decision-making

authority with respect to the District's retaliation against Amos, Amos has alleged sufficient facts to establish municipal liability for D.C. and survive Defendants' motion to dismiss.

II.    **Defendants Emeka Moneme and Peter Nickles are Not Entitled to Qualified Immunity.**

Amos has pleaded sufficient facts to state a viable claim that neither Moneme nor Nickles is entitled to qualified immunity in this case. In the alternative, if this Court determines that Moneme and/or Nickles are entitled to qualified immunity, Amos has pleaded sufficient facts that overcome the qualified privilege.

As the Defendants state in the Motion to Dismiss, qualified immunity shields state officials "from liability for their discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); Motion to Dismiss at 25. The Supreme Court has further concluded that qualified immunity is defeated where a defendant violates the clearly established federal right on which a claim for relief is based. *See Elder v. Holloway*, 510 U.S. 510, 515-16 (1994) (citing *Davis v. Scherer*, 468 U.S. 183, 193-96 n. 14; *see also Elder v. Holloway*, 984 F.2d 991, 995 (9th Cir. 1993) (Kozinski, J., dissenting from denial of reh'g en banc)). The Court has also determined that a defendant pleading qualified immunity is only entitled to dismissal before the commencement of discovery where the plaintiff's allegations fail to state a claim of violation of clearly established law. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

As evidenced by the foregoing discussion of Amos' First Amendment claim, Amos' First Amended Complaint does in fact allege sufficient facts to demonstrate a violation of Amos' First Amendment rights. As Amos has alleged these facts, the parties will now need to engage in the discovery process to determine whether or not there is factual evidence supporting Amos'

claims. Thus, pursuant to the Court's holding in *Mitchell*, dismissal of Amos' claims on account of the Defendants' qualified immunity is inappropriate at this stage of the litigation. *See id.* Once discovery has commenced, the parties may find that the Defendants' qualified immunity may be sufficient grounds for dismissal of Amos' claims, but we have not yet reached that point. Taking the facts in the light most favorable to Amos, Amos has stated sufficient allegations to overcome any qualified immunity, thus, Defendants' motion to dismiss Amos' First Amended Complaint should be denied.

III.     **Amos' Complaint Clearly States a Claim under the Whistleblower Protection Act.**

    A.     Amos Clearly Alleged a Violation of the WPA.

In the Motion to Dismiss, Defendants aver that Amos has not alleged facts sufficient to state a violation of the D.C. Whistleblower Protection Act ("WPA"). This argument is meritless. Defendants' habit of twisting the law to suit, instead of reading and applying the entirety of the law as enacted, is unavailing. Under the WPA, "the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal." D.C. Official Code § 1-615.51. The WPA specifically prohibits a supervisor from "[threatening] to take or [taking] a prohibited personnel action or otherwise [retaliating] against an employee because of the employee's protected disclosure . . ." *Id.* § 1-615.53. The WPA defines the term "protected disclosure" as follows:

> [any] disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences "gross mismanagement, gross misuse or waste of public resources or funds, abuse of authority in connection with the administration of a public program or the execution of a public contract, a violation of federal, state, or local law, rule or regulation, or of a term of a contract between the District government and a District government contractor which is

> not of a merely technical or minimal nature; or a substantial and
> specific danger to the public health and safety.

*Id.* § 1-615.52(6). The statute then provides that, for a plaintiff to prevail in an action under the

statute, "the employee must demonstrate: (1) that she made a protected disclosure; and (2), that

such a disclosure was a "contributing factor" in the employer's decision to take an adverse

employment action." *Crawford v. District of Columbia*, 891 A.2d 216, 218 (D.C. 2006); *see also*

D.C. Official Code § 1-615.54(b).

The Defendants argue that Amos' complaint should be dismissed because Amos has not

alleged a sufficient violation of the law nor has Amos alleged a prohibited personnel action

based on his disclosures to the FBI. However, this argument evidences a complete failure to

comprehend the grounds for a motion to dismiss and the allegations in Amos' First Amended

Complaint. The Defendants first argue Amos only identifies one regulation that was allegedly

violated (49 C.F.R. § 26), and Amos' own facts establish that he could not have reasonably

believed that the Defendants actually violated this law. *See* Motion to Dismiss at 28.

Defendants proceed with a lengthy discourse regarding what Defendants claim Amos knew or

should have known regarding the discretion allowed under 49 C.F.R. § 26, the governing federal

regulations relating to Disadvantaged Business Enterprises ("DBE"). See Motion to Dismiss at

28-33. The Defendants focus on the broad discretion allowed regarding the application of DBE

requirements and D.C.'s ability to obtain and authorize waivers for companies who cannot meet

their DBE goals. *See id.* The Defendants then abruptly conclude that because waivers are

permissible under federal and D.C. law, that it is not reasonable for Amos to have believed that

Fort Myer's contract with D.C. evidenced gross mismanagement or any violation of the law. *See*

*id.* at 32-33. This conclusion completely ignores the totality of 49 C.F.R. § 26.

23

Although the federal regulations may allow for discretion in administering the DBE

program, 49 C.F.R. § 26 also contains mechanisms to enforce compliance with the regulations.

The regulations provide that:

> (a)  If you are a firm that does not meet the eligibility criteria of subpart D of this part and that attempts to participate in a DOT-assisted program as a DBE on the basis of false, fraudulent, or deceitful statements or representations or under circumstances indicating a serious lack of business integrity or honesty, the Department may initiate suspension or debarment proceedings against you under 49 C.F.R. § 29.
>
> (b)  If you are a firm that, in order to meet DBE contract goals or other DBE program requirements, uses or attempts to use, on the basis of false, fraudulent or deceitful statements or representations or under circumstances indicating a serious lack of business integrity or honesty, another firm that does not meet the eligibility criteria of subpart D of this part, the Department may initiate suspension or debarment proceedings against you under 29 C.F.R § 29.
>
> (c)  In a suspension or debarment proceeding brought under paragraph (a) or (b) of this section, the concerned operating administration may consider the fact that a purported DBE has been certified by a recipient.  Such certification does not preclude the Department from determining that the purported DBE, or another firm that has used or attempted to use it to meet DBE goals, should be suspended or debarred.
>
> (d)  The Department may take enforcement action under 49 C.F.R. § 31, Program Fraud and Civil Remedies, against any participant in the DBE program whose conduct is subject to such action under 49 C.F.R. 31.
>
> (e)  The Department may refer to the Department of Justice, for prosecution under 18 U.S.C. § 1001 or other applicable provisions of law, any person who makes a false or fraudulent statement in connection with participation of a DBE in any DOT-assisted program or otherwise violates applicable Federal statutes.

49 C.F.R. § 26.107.

Amos' reports to Deputy Director Ken Laden, Deputy Director Carol Kissal, Director

Moneme, Peter Nickles, the OIG and the FBI clearly concerned violations of this section of the

federal regulation.  *See* FAC ¶¶ 28-43.  Amos reported that since being released from its

previous debarment, Fort Myer had entered into a significant number of construction contracts as the prime-contractor benefiting directly from the USDOT's DBE Financial Assistance Program. *See id.* ¶¶ 38-39. Amos reported that Fort Myer is not a qualified-DBE but represents that its subcontracts are with DBE-qualified businesses. *See id.* ¶ 38. Amos' disclosures alleged that Fort Myer knowingly and fraudulently qualified for the federal funds by entering into a subcontract with Peake and using Peake as the certified DBE. *See id.* ¶ 32. Amos reported that Peake is believed to be merely a shell of a company with no vehicles, equipment, business office, or viable assets to substantiate its role as a subcontractor. *See id.* ¶ 42. Amos also disclosed the suspicious position of Parney T. Jenkins, who was formerly convicted of bribing DDOT officials and is now the CEO of Peake. *See id.* ¶¶ 42-43. Amos reported that Ronnie Edwards, before he was fired from DDOT for unrelated ethical reasons, certified Peake as a DBE, and Peake remains a certified DBE (certification #06-1282-1). *See id.* ¶ 39. Moreover, according to Gonzalez's site visit to the Foxhall Road Project, neither Fort Myer, the prime contractor, nor Peake, the sub-contractor, were on the job site and rather, a third company, DEN United was actually doing the work even though it is not a DBE-qualified contractor. *See id.* ¶ 40.

These disclosures and allegations form the basis of a clear violation of 49 C.F.R. § 26.107. As Chief of Staff for DDOT, Amos knew the federal regulations concerning DBEs and was likely aware of the discretion allowed for in the administration of the DBE program. Regardless of the allowed discretion, when Amos discovered the nexus of activities between Fort Myer and DDOT, he also recognized and reasonably believed that D.C. was in violation of the enforcement mechanisms outlined in 49 C.F.R. § 26.107. Amos alleged these facts in his First Amended Complaint, and it is clear that the facts in it, taken in the light most favorable to Amos, demonstrate a violation of federal law.

      B.      Amos Has Alleged a Prohibited Personnel Action Taken by Peter Nickles and He Alleged Prohibited Personnel Actions Based on His Disclosures to the FBI.

As noted above, for a plaintiff to prevail on an action under the WPA, "the employee must demonstrate: (1) that [he] made a protected disclosure; and (2), that such a disclosure was a "contributing factor" in the employer's decision to take an adverse employment action." *See Crawford*, 891 A.2d at 218; *see also* D.C. Official Code § 1-615.54(b). Amos has alleged facts sufficient to meet each of these standards.

Amos clearly made protected disclosures when he reported DDOT's unlawful practices to Nickles. Nickles should have known that Amos had reported outside of the chain of his authority since Amos did not ordinarily report to Nickles. As the General Counsel for the Mayor, Nickles was a licensed professional engaged in the practice the law in D.C., and should also have known that such disclosures like those Amos made qualify as protected activity under the WPA. Nickles did not inform Amos of this, and refused to provide any assurances to Amos that neither Amos nor Amos' staff would be retaliated against for reporting DDOT's shady activity.

As the General Counsel for the Mayor, Nickles had a responsibility to uphold the law of D.C. When Amos came to Nickles and disclosed what Amos reasonably believed to be unlawful practices, Nickles should have recognized that Amos' report was a protected disclosure. Then, pursuant to the D.C. WPA, Nickles should have provided Amos with a letter assuring Amos that he could not lawfully be retaliated against on account of Amos' protected disclosures. At the very least, Nickles should have given Amos a verbal assurance against retaliation. Nickles did neither of these things.

The Defendants now argue that Nickles had no authority to recommend or take any remedial or corrective action with regards to the unlawful DDOT activity that Amos reported.

*See* Motion to Dismiss at 34. Defendants aver that Nickles did all he could do in referring Amos to the OIG. *See id.* However, it is clear that Nickles did in fact have the "authority to effectively recommend . . . corrective action for the violation of a law, rule, regulation or contract term, or the misuse of government resources . . . ." D.C. Official Code § 1-615.52(a)(5). At the time relevant to the Complaint, Nickles was General Counsel to the Mayor of D.C. *See* FAC ¶ 13. As the Mayor's General Counsel, it is reasonable to believe that Nickles was one of the Mayor's closest advisors, a belief that is bolstered by Nickles later promotion to his current position as the Interim Attorney General for D.C. *See id.* This relationship between Nickles and the Mayor in fact did put Nickles in a position of "authority to effectively recommend…corrective action for the violation of a law…" D.C. Official Code § 1-615.52(a)(5). Upon meeting with Amos and hearing his disclosures, it would have taken little effort on Nickles' part to inform the Mayor of the current situation and recommend that the Mayor exercise his executive authority to prohibit Moneme from terminating Amos in retaliation for Amos' disclosures. Nickles did not make this small effort, and now the Defendants are attempting to downplay Nickles' authority.

Defendants then argue that according to *Zirkle*, Amos has not alleged any prohibited personnel actions that are causally connected to Amos' disclosures to the FBI. *See Zirkle v. District of Columbia*, 830 A.2d 1250, 1260 (D.C. 2003); Motion to Dismiss at 34. Even assuming, as the Defendants allege, that they were unaware of Amos' disclosures to the FBI at the time when Moneme delivered the notice of Amos's pending termination, all of the Defendants became aware of Amos' protected activity when Amos *and his attorney* reported Amos' disclosures to Chip Richardson, Interim General Counsel to the Mayor. *See* FAC ¶¶ 154-55. At that time, when it is undisputed that the Defendants became aware of Amos' protected disclosures, Amos was still an employee on administrative leave from DDOT. *See id.* ¶ 156.

The Defendants had an opportunity to retract Amos' termination and attempt to alleviate their retaliation towards him. However, despite their knowledge that Amos had engaged in constitutionally protected disclosures by reporting DDOT's unlawful activity to the FBI, Moneme carried out Amos' termination. *See id.* ¶ 147. It is notable also that even after certainly learning of Amos' protected disclosures to the FBI, Nickles still made no effort to contact Amos or assure him of his rights under the WPA. The WPA requires that an employee's protected disclosures be a contributing factor in the adverse action taken by the employer against the employee, and given the temporal proximity of Amos' disclosures to the date of his notice of termination, the Defendants' opportunity to retract the termination decision, and Defendants' conscious and knowing decision to continue to terminate Amos knowing of his protected status, Amos has alleged sufficient facts to demonstrate plausibly that his protected disclosures were a contributing factor in the Defendants' decision to terminate him.

Thus, considering these arguments, and taking the facts in the complaint in the light most favorable to Amos, the Defendants' motion to dismiss should be denied.

## Conclusion

WHEREFORE, and for all the foregoing reasons, Defendants' Motion to Dismiss Amos' First Amended Complaint should be DENIED.

## REQUEST FOR A HEARING

Amos requests an oral hearing on all issues.

Respectfully submitted,


/s/ Adam Augustine Carter
Adam Augustine Carter, D.C. Bar No. 437381
R. Scott Oswald, D.C. Bar No. 458859
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
acarter@employmentlawgroup.net
soswald@employmentlawgroup.net
*Counsel for Plaintiff Stephen Amos*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of July, 2008, a true and correct copy of the

foregoing Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants'

Motion to Dismiss Plaintiff's First Amended Complaint, and a proposed Order has been served

upon the following via ECF:


Leah Brownlee Taylor, Esq.
Assistant Attorney General
Office of the Attorney General for the District of Columbia
441 4th Street N.W., 6th Floor South
Washington, D.C.  20001
leah.taylor@dc.gov

*Counsel for Defendants District of Columbia,*
*Emeka C. Moneme and Peter J. Nickles*


/s/ Adam Augustine Carter
Adam Augustine Carter

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| STEPHEN P. AMOS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DISTRICT OF COLUMBIA, | ) |
| | ) |
| and | ) |
| | ) |
| EMEKA C. MONEME, | ) |
| | ) |
| and | ) |
| | ) |
| PETER J. NICKLES, ESQ., | ) |
| | ) |
| Defendants. | ) |

_____)

**Civil Action No. 08-00554 (RMC)**

**ORDER**

UPON CONSIDERATION of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, Plaintiff's Opposition thereto, and the entire record herein, it is this _____ day of _____, 2008

ORDERED that Defendant's Motion to Dismiss Plaintiff's First Amended Complaint be, and hereby is, DENIED.

_____
The Hon. Rosemary M. Collyer
United States District Judge

Send to:

Adam Augustine Carter, Esq.
R. Scott Oswald, Esq.
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
acarter@employmentlawgroup.net
soswald@employmentlawgroup.net
*Counsel for Plaintiff Stephen Amos*


Leah Brownlee Taylor, Esq.
Assistant Attorney General
Office of the Attorney General for the District of Columbia
441 4th Street N.W., 6th Floor South
Washington, D.C.  20001
leah.taylor@dc.gov
*Counsel for Defendants District of Columbia,*
*Emeka C. Moneme and Peter J. Nickles*