UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| STEPHEN P. AMOS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 08-554 (RMC) |
| THE DISTRICT OF COLUMBIA, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM OPINION

Stephen P. Amos sues the District of Columbia; Emeka Moneme, Director of the D.C. Department of Transportation ("DDOT"); and Attorney General for D.C., Peter Nickles, for alleged violations of his rights under the First Amendment to the Constitution of the United States and, against D.C. alone, an alleged violation of the District of Columbia Whistleblower Protection Act ("WPA"), D.C. Code § 1-615.51 *et seq.*, in relation to his discharge from DDOT. Prior to the termination of his employment with DDOT, Mr. Amos complained about alleged contractor improprieties to two DDOT Deputy Directors; Director Moneme; Attorney General Nickles (then General Counsel to D.C. Mayor Adrian Fenty); the D.C. Office of the Inspector General ("OIG"); and the Federal Bureau of Investigation ("FBI"). He alleges that Director Moneme unlawfully discharged him because he made these complaints. Before the Court are Defendants' Motion to Dismiss Complaint [Dkt. # 7] and Motion to Dismiss First Amended Complaint [Dkt. # 10]. The Court will deny the former motion as moot and, for the reasons explained herein, will grant in part and deny in part the latter motion.

## I. FACTS

The facts are taken from Mr. Amos's First Amended Complaint and read in a light most favorable to him. *See Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 15-17 (D.C. Cir. 2008).

DDOT Director Moneme hired Mr. Amos in July 2007 to fill the position of Chief of Staff in the Management Supervisory Service, DDOT. Mr. Amos was the number two person in the office and reported directly to Director Moneme. In this role, Mr. Amos supervised the Offices of Integrity and Compliance, Risk Management/Emergency Preparedness, Communications, and Administrative and Management Support Services. His fundamental role was to assist DDOT management and employees to achieve "the highest level of integrity in order that the agency's external customers receive reliable and efficient service." First Am. Compl. ¶ 15.

On July 23, 2007, Mr. Amos first learned about Fort Myer Construction Corporation, a DDOT contractor, when a report disclosed that a street had collapsed due to the suspected use of low-grade asphalt on a contracting job. During an investigation into the incident, Mr. Amos learned that Fort Myer had been convicted of bribing a number of DDOT employees, five years earlier, in an investigation conducted by the FBI. The conviction led to Fort Myer being debarred from working on federally-funded construction projects for a period of eighteen (18) months.

On December 3, 2007, Francisco Edwin Gonzalez, a subordinate to Mr. Amos, reported Mr. Gonzalez's concerns about possible improprieties in the relationship among officials of DDOT, Fort Myer, Peake Construction Company and Pessoa Construction Company. Mr. Gonzalez expressed concern that Fort Myer had been working with various DDOT officials and using fraudulent means to obtain U.S. Department of Transportation ("USDOT") funding since its

debarment ended, such as contracting with Peake, a purported Disadvantaged Business Enterprise ("DBE"), to qualify for some contracts. When, in August 2007, Mr. Gonzalez visited one such project — the Foxhall Road N.W. Safety Improvements Road Project — where Peake was supposed to be working as a subcontractor to Fort Myer, Peake was not performing the work but had further subcontracted to DEN United, an entity unauthorized by DDOT to be on the site. Mr. Gonzalez told Mr. Amos that he believed Peake was a shell company because it had no assets, no equipment, no trucks, and no office, and its Chief Executive Officer is Parney Jenkins, Sr., a former DDOT official convicted of taking bribes from Fort Myer. Mr. Gonzalez submitted a formal memo to Mr. Amos on December 4, 2007, laying out his concerns about the Foxhall Road, N.W. Safety Improvements Project and also the South Capitol Street, Near Term Improvement Project, at which Fort Myer had contracted sixty-two percent (62%) of its work to a company that was not DBE qualified.[1]

On December 5, 2007, Mr. Amos reported the concerns voiced by Mr. Gonzalez to DDOT Deputy Directors Ken Laden and Carol Kissal, both jointly and separately. Mr. Amos told Ms. Kissel that he planned to speak to the OIG and she became upset, stating that D.C. City Administrator Dan Tangerlini (formerly DDOT Director) had advised her to manage this kind of risk-related issue internally. She told Mr. Amos that it would be better if the information did not go outside the Director's Office.

Later the same day, Director Moneme came to Mr. Amos's office and Mr. Amos repeated the information learned from Mr. Gonzalez. Mr. Amos told Director Moneme that he

---

[1] The memo from Mr. Gonzalez also reported that Fort Myer had been notified of its noncompliance with its DBE obligations in September 2007, had responded that it was committed to its DBE goal and assured DDOT that it would meet its goal, but that it later requested a waiver. DDOT thereafter began an investigation into Fort Myer's compliance with its DBE obligations, the results of which are not in the record.

wanted to report this information to the OIG. Director Moneme allegedly became angry and ordered Mr. Amos "to keep the information internal and 'quiet' and not share it with the OIG." *Id.* ¶ 59. Nevertheless, Mr. Amos contacted the OIG via email and scheduled a confidential meeting for December 7, 2007.

In the meantime, Mr. Amos called Mr. Nickles on December 6, 2007, gave an overview of his concerns, and asked for a private meeting. The meeting was scheduled rapidly, only 30 minutes later. When they met, Mr. Amos detailed his concerns and related to Mr. Nickles the information that Mr. Gonzalez had told him. Mr. Nickles told Mr. Amos to report his information to the OIG.

Mr. Amos met with Leonard Odom, Assistant Inspector General, on December 7, 2007. Although Mr. Amos was ready to detail all of his concerns, he was concerned about retaliation and asked Mr. Odom for protection. Mr. Odom responded that without knowing more details, he could not guarantee that the information would remain confidential or that Mr. Amos would not be retaliated against. When Mr. Amos requested a joint OIG/FBI meeting, Mr. Odom said that he first needed to know more details and to review the documents. Amos decided not share any more specifics.

On December 11, 2007, Mr. Amos called Mr. Nickles to request a letter of assurance against retaliation but Mr. Nickles replied that "he did not have the authority to make assurances without knowing more about the situation." *Id.* ¶ 85. Mr. Amos emailed a number of documents to Mr. Nickles that involved an investigation regarding Kathleen Penney, DDOT's new Chief Engineer, "in which the Office of Integrity and Compliance was thwarted and could not conduct a simple fact-finding investigation." *Id.* ¶ 88. Mr. Amos apparently told Mr. Nickles that, "[a]t

Tangerlini's direction, Moneme counseled Amos not to pursue this matter concerning Penney." *Id.* ¶ 89. Within 30 minutes, Mr. Amos was asked to meet with Mr. Nickles. Mr. Nickles chastised Mr. Amos for his failure to disclose his concerns fully in meeting with the OIG on December 7. Mr. Amos again asked for a letter to protect himself and his subordinates but Mr. Nickles responded, "'I do not make such commitments on a whim for employees that are in jeopardy and no letter of assurance will be forthcoming.'" *Id.* ¶ 93. Mr. Amos left the meeting with Mr. Nickles and immediately contacted the FBI, to whom he made full disclosures.

On the next day, December 12, 2007, Director Moneme held the first of a series of previously-scheduled Contract Meetings with the relevant parties present: Procurement, General Counsel, Civil Rights, Office of Integrity, and Mr. Amos, Chief of Staff. During the meeting, Director Moneme received an emergency call and abruptly postponed the rest of the meeting. Later that day, he came to Mr. Amos's office and allegedly screamed at Mr. Amos for "betraying" him by talking to the OIG. *Id.* ¶ 105. "Moneme said that the Mayor's Office had informed him that Amos had breached his trust and that Amos' actions had been inappropriate because this should have remained an internal matter." *Id.* ¶ 106. Director Moneme further said that Mr. Amos should be "sequestered in his office" or "escorted out of the building." *Id.* ¶ 108. As he left, Director Moneme demanded Mr. Amos's notes from the morning meeting, told him that he would be "precluded from all further investigations," and threatened, "you're done." *Id.* ¶¶ 109-111.

Mr. Amos left the building and sent an email to Mr. Nickles, summarizing all conversations to date and saying that he felt "compelled to communicate that which had been stymied internally and that which he believed to be an on-going criminal enterprise affecting the District of Columbia." *Id.* ¶ 114.

On January 8, 2008, Mr. Amos met with Director Moneme for his routine morning meeting, with Ms Kissal present. Asserting that Mr. Amos's office had "poor controls," Director Moneme announced that he was removing responsibility for "Position Authority" (control of employees) from Mr. Amos and assigning it to Ms. Kissal, who directed the Office of Resource Management. *Id.* ¶¶ 122-23. Director Moneme made the same announcement in a later meeting that morning with all the Associate Directors present, stating that Mr. Amos had no personnel expertise and that Director Moneme was unhappy with Mr. Amos's hiring strategy. *Id.* ¶ 124. This announcement contrasted sharply with Director Moneme's statement in late December 2007 that Mr. Amos's hiring campaign "was one of the great achievements of the past year." *Id.* ¶ 126.

Mr. Amos met with FBI agents on January 9, 2008, and, on that date, his lawyer sent a letter to Mr. Nickles, with a copy to Director Moneme, stating that Mr. Amos was a whistleblower, had engaged in protected activity, and should not suffer further retaliation. The letter was faxed to Director Moneme's personal fax machine on January 10, 2008.

On January 11, 2008, Director Moneme met with Mr. Amos and Ms. Penney. The two men had something of an argument concerning Mr. Amos's role and his authority over persons who had directly reported to him prior to January 8. Director Moneme insisted that he had been Chief of Staff in the past and knew Mr. Amos's role: "you will defer to the Associate Directors and so will your subordinates (the Operations Managers)." *Id.* ¶ 136. He added that employees who worked for Mr. Amos were "not to do anything without Kathleen Penney's permission." *Id.* ¶ 137. When Mr. Amos protested that various employees reported to him, and not to Ms. Penney, and that he could not effectively serve as Chief of Staff in such an arrangement, Director Moneme allegedly "blew up" and yelled, "Am I not still the Director?" *Id.* ¶ 140.

Director Moneme came to Mr. Amos's office that afternoon and handed him a letter of termination, effective January 28, 2008. Director Moneme said that Mr. Amos would be on administrative leave until that date and must leave the office immediately. After gathering his things and sending an email to his attorney, Mr. Amos left.

Mr. Amos and his lawyer met further with the FBI and OIG on January 22, 2008, to further discuss all of the preceding events and allegations. On January 23, 2008, Mr. Amos and his lawyer met with Andrew T. "Chip" Richard, III, the Interim General Counsel to the Mayor after Mr. Nickles became Acting Attorney General for the District of Columbia, to report his disclosures to the FBI.

Mr. Amos filed his First Amended Complaint on June 20, 2008, naming the District of Columbia and Messrs. Moneme and Nickles as Defendants.[2] Count I alleges that all Defendants violated Mr. Amos's First Amendment rights of free speech by retaliating against him for making the disclosures; Count II alleges that all Defendants violated the First Amendment and Mr. Amos's rights under 42 U.S.C. § 1983 by terminating his employment; Count III alleges that the District, but not other Defendants, violated the D.C. WPA by retaliating against Mr. Amos because of his disclosures. He seeks declaratory judgment that his rights have been violated, record expunction, reinstatement, backpay, compensatory damages, punitive damages, and attorney fees.

---

[2] Director Moneme and Mr. Nickles are sued in both their official and personal capacities. A suit against them in their official capacities is really a lawsuit against D.C. and would ordinarily be dismissed on that basis. However, because the Court will dismiss Counts I and II in their entirety, and Director Moneme and Mr. Nickles are not named in the remaining Count III, there is no need to do so in this case.

## II.  LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim.  A sufficient complaint "contains a short and plain statement of the claim showing that the pleader is entitled to relief" enough "to give a defendant fair notice of the claims against him."  *Ciralsky v. CIA*, 355 F.3d 661, 668-70 (D.C. Cir. 2004) (quoting Fed. R. Civ. P. 8(a)).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted).

The court must treat the complaint's factual allegations — including mixed questions of law and fact — as true, drawing all reasonable inferences in the plaintiff's favor.  *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *see also Aktieselskabet*, 525 F.3d at 17 (under Rule 12(b)(6), a court must construe a complaint liberally in the plaintiff's favor, accepting all of the allegations in the complaint as true, even if doubtful in fact) (citing *Twombly*, 127 S. Ct. at 1965).  Even so, the facts alleged "must be enough to raise a right to relief above the speculative level," *Twombly*, 127 S. Ct. at 1965, and the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations.  *Aktieselskabet*, 525 F.3d at 16 n.4; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## III.  ANALYSIS

The District of Columbia insists that the reports by Mr. Amos to officials of the D.C. government were part of his job duties and, thus, not protected by the First Amendment and that his reports to the FBI, even if protected, did not lead to his termination.  It also asserts that the First Amended Complaint fails to state a claim under the WPA because Mr. Amos's reports were not "protected disclosures" since they revealed no unlawfulness, and that there was no "prohibited personnel action" since Mr. Nickles was not a "supervisor" and Director Moneme decided to discharge Mr. Amos before he knew about Mr. Amos's disclosures to the FBI.  Thus, it asks that the First Amended Complaint be dismissed in whole.

### A.      First Amendment Claims (Counts I and II)

The parties do not dispute that the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Id.* at 418.  Because "[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission[,]" *id.* at 422-23, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities."  *Id.* at 424.  Thus, if Mr. Amos's reports "fall[] into this category," as D.C. asserts, "his allegation of unconstitutional retaliation must fail."  *Id.*

In this case, there is no doubt that Mr. Amos's job duties as Chief of Staff to DDOT required him to oversee investigations into compliance with all regulations, to report any untoward conduct, and to ensure that DDOT achieved "the highest level of integrity in order that the agency's external customers receive reliable and efficient service." First Am. Compl. ¶ 15. Indeed, investigations were Mr. Amos's "main responsibility." *Id.* ¶ 109. Mr. Amos concedes that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Pl.'s Opp'n at 10 (quoting *Garcetti*, 547 U.S. at 418). Nonetheless, he pins his argument to the Supreme Court's additional statement in *Garcetti* that "public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* (quoting *Garcetti*, 547 U.S. at 417). From this, he seeks to draw a "subtle difference between: 1) speech in the normal chain of command, and 2) speech pursuant to official duties." *Id.* at 11.

Mr. Amos notes that writing a letter to a local newspaper concerning public school funding, even when authored by a school teacher, is protected by the First Amendment because letter-writing is "the kind of activity engaged in by citizens who do not work for the government." *Id.* (quoting *Garcetti*, 547 U.S. at 423). He cites *Williams v. Johnson*, 537 F. Supp. 2d 141, 152 (D.D.C. 2008), for the proposition that the D.C. Chief of the Department of Health may have spoken as a private citizen when she made private disclosures to a member of the D.C. Council, even though her job duties required her to testify before the Council. *Id.* at 12 (because Ms. Williams's supervisors became aware of the meeting only after it occurred, the court found that the allegations raised "a reasonable inference that Plaintiff's supervisors were not aware of, and therefore did not authorize, the meeting" and that Ms Williams may have been acting as a private citizen) (quoting *Williams*, 537 F. Supp. 2d at 152). Drawing a direct line from these cases to his own facts, Mr.

Amos contends that because he was forced by Director Moneme's inaction to take his concerns outside of DDOT and outside of his normal chain of command, to Mr. Nickles, the OIG and the FBI, "even if Amos' disclosures to Moneme are not protected, because Amos was officially bound to report to Moneme, his disclosures to Nickles, the OIG and the FBI clearly do merit constitutional protection." *Id.* at 12-13. Alternatively, Mr. Amos argues that his disclosures made while he was acting in his role as DDOT's Chief of Staff are distinct from his subsequent disclosures to the FBI, the OIG and the General Counsel to the Mayor, made while he was on administrative leave pending discharge, and that it cannot be said that those subsequent disclosures were done pursuant to his official duties.

Mr. Amos's argument has a significant flaw: according to his own averments, DDOT's Standard Operating Policy ("SOP") provided that if the agency fails to act after receiving a report from the Chief of Staff, and the Chief believes that the failure to act would compromise the agency's ability to competently carry out its mission, "the Chief shall notify the appropriate District of Columbia officials in order to ensure that proper and immediate action is taken." First Am. Compl. ¶ 60. Indeed, Mr. Amos concedes that he made the disclosure to Mr. Nickles "pursuant to the above-referenced SOP that directed Amos to report potential criminal activity to other D.C. officials in the obvious absence of any corrective activity being taken within DDOT." *Id.* ¶ 66. Mr. Amos avers that he "believed these allegations of criminal fraud among DDOT officials and DDOT contractors were 'of such an egregious manner that failing to act' would compromise DDOT and 'its ability to competently carry out its operations/mission.'" *Id.* ¶ 67 (quoting DDOT's SOP). For these reasons, Mr. Amos admits that even before meeting with Mr. Nickles he "already had an appointment set with Alfred Miller ('Miller'), Deputy Assistant Inspector General, for December 7,

2007, and Nickles encouraged Amos to brief Miller as to the more detailed aspects of Amos' concerns." *Id.* ¶ 70; *see also id.* ¶ 61 ("Pursuant to the SOP, Amos contacted the OIG via email, without consulting Director Moneme, and scheduled a confidential meeting for December 7, 2007"); *id* ¶ 107 (Mr. Amos's reports to OIG were not inappropriate because "Amos acted in accordance with current DDOT SOPs and in accordance with Nickles' direction"). Thus, the distinction Mr. Amos attempts to draw between speech to persons in his chain of command and speech pursuant to his official duties is, at least in this case, a false distinction because as Mr. Amos's own averments establish, Mr.Nickles and the OIG *were* in his chain of command with respect to these disclosures. That some conversations with Mr. Nickles and OIG happened while Mr. Amos was on administrative leave, but still employed as Chief of Staff to DDOT, does not change this fact. Accordingly, these reports were not protected as First Amendment speech.

Mr. Amos's reports to the FBI are a closer call. However, the Court need not decide whether those reports were protected by the First Amendment. In order to state a retaliation claim for exercising First Amendment rights, a public employee must show that the speech "was a substantial or motivating factor" for the retaliation. *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994). But no one in the D.C. government knew that Mr. Amos had contacted the FBI until after Director Moneme had decided to discharge him. On January 11, 2008, Director Moneme "handed Amos a letter of termination, which provided that Amos' termination was effective January 28, 2008, and Amos would be on administrative leave until that time." *Id.* ¶ 147. It was not until January 23, 2008, when "Amos and his attorney met with Andrew T. 'Chip' Richardson, III ('Richardson') the Interim General Counsel to the Mayor for the District of Columbia," *id.* ¶ 154, that D.C. first learned of "Amos' cooperation with the FBI . . . ." *Id.* ¶ 155. Mr. Amos avers that the January 23

"disclosure to Richardson put D.C., Nickles and Moneme all on notice that Amos had made protected disclosures to the FBI." *Id.* Accordingly, Mr. Amos's reports to the FBI could not have been a substantial or motivating factor for his prior discharge.[3] *See Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) (if the government was unaware of the employee's speech, "it could not possibly have been a substantial or motivating factor" for the adverse employment action, and thus the employee's "First Amendment retaliation claim would necessarily fail"); *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002) ("In order to retaliate against an employee for his speech, an employer must be aware of that speech.").

Mr. Amos attempts to cure this defect by arguing in opposition that D.C.'s subsequent failure to retract the notice of Mr. Amos's termination of employment after learning of his disclosure to the FBI is itself an additional act of retaliation. Pl.'s Opp'n at 18-19. The Court is unpersuaded. The First Amended Complaint alleges that "Amos' protected speech was a substantial or motivating factor in the Defendants' *termination* of Amos' employment" and that "Defendants would not have *terminated* Amos but for his protected speech." First Am. Compl. ¶¶ 168 & 169 (emphasis added). The First Amended Complaint makes no mention of D.C.'s failure to retract the notice of Mr. Amos's termination of employment. Thus, the retaliatory act of which Mr. Amos complains is D.C.'s decision to discharge him, a decision that was made before D.C. was aware of Mr. Amos's disclosures to the FBI. D.C.'s subsequent failure to retract that decision after learning of Mr. Amos's reports to the FBI does not operate retroactively to establish causation for the discharge.

---

[3] For these same reasons, even assuming that the First Amendment protected Mr. Amos's conversations with Mr. Nickles and OIG that occurred while Mr. Amos was on administrative leave, as Mr. Amos contends, his retaliation claims would still fail for lack of causation.

**B.     Whistleblower Claim (Count III)**[4]

The District of Columbia WPA provides that "[a] supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure . . . ." D.C. Code § 1-615.53. "Protected disclosure" is defined, in relevant part, as "any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or public body that the employee reasonably believes evidences . . . [a] violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature." *Id.* § 1-615.52(a)(6)(D). The WPA specifically provides that it is intended to "[p]rotect employees from reprisal or retaliation for the performance of their duties." *Id.* § 1-615.51(7).

D.C. argues that none of Mr. Amos's disclosures was a "protected disclosure" within the meaning of the WPA because, given the broad discretion and available waivers in the contracting regulations that Mr. Amos thought were being violated, it was not reasonable for Mr. Amos to believe that anything he reported was illegal. Defs.' Mem. at 28-33. D.C. analogizes to *Zirkle v. District of Columbia*, 830 A.2d 1250 (D.C. 2003), which found the plaintiff's belief of illegality to be unreasonable because the policy complained of was "so clearly a proper exercise of discretion . . . ." *Id.* at 1260. The argument fails because that is not the case here.

Mr. Amos reported, *inter alia*, that "Fort Myer had been working closely with DDOT officials to fraudulently obtain USDOT funding for its contracts." First Am. Compl. ¶ 32. Mr.

---

[4] The Court has subject matter jurisdiction over this claim, despite the dismissal of Mr. Amos's other claims, because the amount in controversy exceeds $75,000 and is between citizens of different states. *See* 28 U.S.C. § 1332(a)(1); First Am. Compl. ¶¶ 10-13; Prayer for Relief D.

Amos further reported that "he believed Peake is a shell company because it has no assets, no equipment, no trucks, and no office, and its CEO is Parney Jenkins, Sr.[,] . . . a former DDOT official who was convicted of taking bribes from Fort Myer." *Id.* ¶¶ 42 & 43.  Inasmuch as these reports concern allegations of fraud, they are more substantial than mere non-compliance with DBE goals.  While D.C. may be correct that "non-compliance alone[] does not establish a violation of the law or misconduct[,]" Defs.' Mem. at 28-29, Mr. Amos complained about more than non-compliance with DBE goals; he complained about fraud, which is illegal under the applicable contracting regulations.  *See* 49 C.F.R. § 26.107.  Thus, because Mr. Amos had a reasonable basis to believe that fraud was illegal, his disclosures were "protected disclosure[s]" within the meaning of the WPA.

D.C. lastly argues that Mr. Amos's whistleblower claim fails because Mr. Nickles did not take a "prohibited personnel action" against him and because his disclosures to the FBI were not a contributing factor in a "prohibited personnel action" taken against him.  Defs.' Mem. 33-34; Reply 10-12.  The Court fails to see the relevance of either argument.

The WPA defines "prohibited personnel action" as including but not limited to: "recommended, threatened, or actual termination, demotion, suspension, or reprimand; involuntary transfer, reassignment, or detail; referral for psychiatric or psychological counseling; failure to promote or hire or take other favorable personnel action; or retaliating in any other manner against an employee because that employee makes a protected disclosure . . . ." D.C. Code § 1-615.52(a)(5).  Mr. Amos's whistleblower claim is against D.C. alone, not the individual defendants.  *See* First Am. Compl. Count III.  He alleges that *D.C.* took a "prohibited personnel action" against him by, *inter alia*, "stripping Amos of his job responsibilities, placing Amos on administrative leave, and

-15-

terminating Amos' employment with DDOT . . . ." *Id.* ¶ 189.  There is no doubt that Director Moneme was a "supervisor" within the meaning of the WPA. *See* D.C. Code § 1-615.52(a)(8). Thus, Mr. Amos's whistleblower claim against D.C. does not fail because it was Director Moneme and not Mr. Nickles who took the "prohibited personnel action" against him. *See id.* ¶¶ 122 & 147.

The WPA requires Mr. Amos to demonstrate that a "protected disclosure" was a contributing factor in a "prohibited personnel action" taken against him. *See* D.C. Code § 1-615.54(b); *Zirkle*, 830 A.2d at 1260.  Mr. Amos alleges that each of his disclosures was a "protected disclosure" under the WPA, not just his disclosures to the FBI.  *See* First Am. Compl. ¶ 187. Accordingly, the whistleblower claim in the First Amended Complaint against D.C. does not fail because Mr. Amos's disclosures to the FBI were not a contributing factor to the alleged "prohibited personnel action[s]."

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss First Amended Complaint [Dkt. # 10].  Counts I and II will be dismissed; Count III will not.  Defendants' Motion to Dismiss Complaint [Dkt. # 7] will be denied as moot.  A memorializing Order accompanies this Memorandum Opinion.


DATE: December 16, 2008                         /s/
                                                ROSEMARY M. COLLYER
                                                United States District Judge